**Jackson D. BLANDING, Plaintiff,**

v.

**PENNSYLVANIA STATE POLICE, et al., Defendants.**

**Civ. A. No. 90–2860.**

United States District Court, E.D. Pennsylvania.

Dec. 17, 1992.

Stuart Wilder, Newtown, PA, for plaintiff.

Denise A. Kuhn, John G. Knorr, III, Deputy Attys., Gen., Philadelphia, PA, for defendant.

## MEMORANDUM

LOWELL A. REED, Jr., District Judge.

This is a case of alleged racial discrimination on the part of the defendants, the Pennsylvania State Police, Lt. Thomas O. Marakovits, and Commissioner Ronald M. Sharpe. Presently before me are two motions for summary judgment. Defendants' seek summary judgment on all claims (Document No. 12), and plaintiff seeks partial summary judgment on his claim arising out of 42 U.S.C. § 1983 (Document No. 13).

This Court has jurisdiction over this case pursuant to 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

For the reasons discussed below, defendants' motion for summary judgment will be granted, and plaintiff's motion for summary judgment will be denied.

## I. FACTUAL BACKGROUND

Plaintiff Jackson D. Blanding ("Blanding"), a black male, was a probationary trooper with the Pennsylvania State Police (the "PSP"), until he was dismissed on December 9, 1988. Blanding alleges that his dismissal from the PSP was racially discriminatory and violated his right to procedural due process. Blanding enlisted in the PSP on June 29, 1987. He was a cadet at the PSP Academy during the first five months of his enlistment. After graduating from the Academy on December 1, 1987, Blanding became a "probationary trooper." All graduates of the PSP Academy remain probationary troopers for an eighteen-month period. Blanding was assigned to Bethlehem Troop (Bucks, Lehigh and Northampton counties) where he worked until his dismissal one year later.

Blanding's dismissal from the PSP arose from an off-duty incident which occurred on June 16, 1988 at the apartment he shared with his girlfriend at the time, Lisa Serafine ("Serafine"), a white female. There are two versions of the June 16, 1988 incident.

According to Serafine, she and Blanding were in a heated argument when Blanding physically attacked her and pointed his loaded off-duty revolver at her head inside their apartment. The dispute spilled out onto the street, and a group of youths intervened in the argument, apparently to come to Serafine's aid. Blanding exchanged blows with one of the youths and then entered the apartment to retrieve his revolver. Blanding returned outside with his revolver tucked into his pants, and shots were fired in his direction.

Blanding recounts a different version of the incident. According to Blanding, he and Serafine were having an argument inside the apartment when Serafine became belligerent. He claims that as she attempted to kick him in the groin, he struck her in self defense. Soon thereafter, she packed some of her things to leave. As she was leaving, Blanding claims she created a scene outside by screaming obscenities at him. Blanding states that he walked outside to calm her down. However, Blanding

claims, Serafine continued to yell and threatened to fabricate a story to his commanding officer to cause him trouble at work. At that point, Blanding states that he turned his back on her and walked towards his apartment. Before he was inside, however, he claims that a group of youths who were standing on the street began taunting him. He testified in his deposition that he introduced himself as a State Trooper and told them he did not want any trouble. Blanding admits to exchanging blows with one of the youths, but he claims he did so only after being physically threatened with the metal lid to a garbage can. In response to the fight, the youths retreated, but said they would return to kill Blanding. Blanding claims that he entered his apartment to retrieve his revolver because he feared they were telling the truth. After retrieving his revolver and returning outside, several shots were fired in his direction.

Almost immediately after the shooting, members of the Philadelphia Police Department converged on the scene and took statements from Blanding, Serafine and other witnesses. The police determined that Blanding never fired any shots.

As a probationary trooper, Blanding was dismissed according to a process described in Field Regulation 3–3 ("F.R. 3–3"). This process began when Blanding reported the incident to his supervisor. Because the incident involved a shooting, Lieutenant Thomas O. Marakovits ("Marakovits") of the PSP's Bureau of Professional Responsibility ("BPR") was assigned to investigate.

Marakovits first interviewed Blanding regarding the incident on June 22, 1988. Marakovits concentrated on the events which occurred outside Blanding's apartment because, he says, Blanding's report to his supervisor did not discuss the events which occurred prior to the shooting. At the interview, Marakovits requested that Blanding prepare a written statement, and Blanding complied. In addition, Marakovits received a copy of the Philadelphia Police report, interviewed the Philadelphia detective who investigated the incident, and interviewed one of Blanding's neighbors

and a friend of Serafine's. Serafine had since moved to Florida, and Marakovits interviewed her over the telephone.

On July 6, 1988, Marakovits interviewed Blanding a second time. Marakovits informed Blanding that he had received information from other sources which was inconsistent with Blanding's version of the incident. He asked Blanding questions about the events which occurred inside the apartment prior to the shooting. Because Blanding had not discussed these events in his first written statement, Marakovits allowed Blanding to submit a second written statement to provide a complete description of the entire incident. Soon thereafter, Blanding submitted a second written statement to Marakovits in which he described the argument with Serafine which occurred inside the apartment.

Marakovits then prepared a "General Investigation Report" ("GI") which contained a detailed account of the investigation, summaries of witnesses interviewed, and relevant documents. Marakovits offered no opinion as to whose version of the incident he found more credible nor did he make any recommendation as to what discipline, if any, Blanding should receive.

Blanding claims that the GI contains several errors. He claims that: (1) the account of the July 6, 1988 interview incorrectly states that Blanding admitted to having smoked marijuana with Serafine when actually he only admitted to being present on two occasions when marijuana was being smoked, (2) the statement that Blanding failed to identify himself as a police officer is incorrect, (3) the statement that Marakovits provided Blanding with the Philadelphia Police Department's report on the incident is incorrect, and (4) the account of the July 6, 1988 incorrectly states that Blanding did not discuss Serafine's threat to contact his superiors.

Marakovits submitted the GI to his supervisor who forwarded it to Blanding's Troop Commander, Captain Robert G. Werts ("Werts"). Based on the contents of the GI, Werts found that Blanding had violated four internal PSP regulations:

(1) F.R. 1–1, Section 1.01—Unbecoming Conduct.

(2) F.R. 1–1, Section 1.02—Conformance to Laws

(3) F.R. 1–1, Section 1.28—Carrying Firearm/Weapon and Ammunition

(4) F.R. 1–2, Section 2.31—Police Action—Off Duty.

Werts then prepared a Disciplinary Action Report ("DAR") and issued it to Blanding. Blanding had the option of being represented by an attorney at the issuance of the DAR, but it appears from the record that he declined. *See* Defendants' Motion for Summary Judgment, at 6; Blanding's Motion for Summary Judgment, at 4. Blanding was not entitled to receive copies of the GI or the supporting documents. However, Marakovits testified at his deposition that he did apprise Blanding of the information he had received from the Philadelphia Police and Serafine which was inconsistent with Blanding's version of the events. Under F.R. 3–3, Blanding was permitted to make a written response to the DAR within ten days of its receipt. Although he was late, Blanding did in fact respond to the DAR.

Meanwhile, Werts forwarded the DAR to the Department Disciplinary Officer, Captain Ronald A. Rostalski ("Rostalski") for a decision on the penalty to be imposed. Although it is not customary for the DAR to contain recommendations from the troop commander, Werts included a recommendation that Blanding be retained. Rostalski testified that, because it was his job to ensure uniformity in the discipline meted out by the PSP, he gave no credit whatsoever to Werts' recommendation. Based on the GI and the DAR, Rostalski determined that Marakovits' telephone interview of Serafine was inadequate and that an in-person interview of her as well as her notarized statement would be better. Thus, on November 16, 1988, Marakovits traveled to Florida, where he interviewed Serafine face-to-face and obtained her notarized statement. He submitted a supplemental GI to the BPR summarizing the interview and attaching the notarized statement.

After reviewing the new material, Rostalski recommended to Deputy Commissioner Glenn A. Walp ("Walp") that Blanding be dismissed. Walp concurred, and their recommendations were forwarded to Commissioner Ronald M. Sharpe ("Sharpe"), who ultimately approved Blanding's dismissal. On December 9, 1988, Werts presented a memorandum to Blanding informing him of his dismissal. Blanding had no right to appeal his dismissal.

Blanding has brought this action against the PSP for racial discrimination in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1). He is suing Marakovits for racial discrimination in violation of 42 U.S.C. § 1981. And, he is suing Sharpe pursuant to 42 U.S.C. § 1983 for dismissing him from his position with the PSP in violation of his Fourteenth Amendment right to procedural due process. Blanding seeks declaratory relief, reinstatement, back pay, front pay, all of the fringe benefits to which he otherwise would have been entitled, compensatory and punitive damages, and attorney's fees and costs.

## II. DISCUSSION

### A. *Summary Judgment Standard*

■■■ The examination to be undertaken of a summary judgment motion in federal court is set forth in Fed.R.Civ.P. 56. Rule 56(c) states that:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citing 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 2725, at 93–95 (1983)). In addition, a dispute over a

material fact must be "genuine," *i.e.*, the evidence must be such "that a reasonable jury could return a verdict in favor of the non-moving party." *Id.*

When a motion for summary judgment is made and supported as provided in ... [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). The evidence proffered does not have to be in a form which would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing ... [required by Rule 56(e) ]." *Id.*

■ The evidence of the nonmoving party is to be considered as true, and justifiable inferences arising from the evidence are to be drawn in his or her favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. If the evidence of the nonmoving party is "merely colorable," or is "not significantly probative," summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. at 2510–11. For example, a nonmoving party may not successfully oppose a summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990). Rather, the nonmoving party must offer specific facts

contradicting the facts averred by the movant which indicate that there is a genuine issue for trial. *Id.* 497 U.S. at 886–88, 110 S.Ct. at 3188.

## B. *Blanding's § 1981 Claim*

■ In Count II of his complaint, Blanding alleges that Marakovits discriminated against him in violation of 42 U.S.C. § 1981 ("section 1981").[1] Section 1981 provides in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, ...

In *Patterson v. McLean Credit Union*, 491 U.S. 164, 176, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989), the Supreme Court held that because "[s]ection 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations[,]" it only applies to the initial formation of a contract. Therefore, "the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." *Id.* at 177, 109 S.Ct. at 2373. The Court of Appeals for the Third Circuit has held that the reasoning of *Patterson* precludes a section 1981 claim for racially motivated discharge because job termination is conduct occurring after formation of the employment contract. *Hayes v. Community General Osteopathic Hosp.*, 940 F.2d 54, 56 (3d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 940, 117 L.Ed.2d 110 (1992). The Court stated that such conduct is more naturally governed by state contract law

---

1. The pertinent part of Blanding's complaint reads:

   51. Mr. Marakovits' actions in intentionally preventing Mr. Blanding from forming a contract with the PSP for employment as a non-probationary trooper constituted an act of discrimination in violation of 42 U.S.C. § 1981.

   52. Mr. Marakovits' actions in intentionally causing Mr. Blanding's discharge from the PSP constituted an act of racial discrimination in violation of 42 U.S.C. § 1981.

and Title VII. *Patterson*, 491 U.S. at 177, 109 S.Ct. at 2372.

Partly in response to the Supreme Court's holding in *Patterson*, Congress passed and President Bush signed the Civil Rights Act of 1991 (the "1991 Act"). Pub.L. No. 102–166, 105 Stat. 1071 (1991). The 1991 Act overrules *Patterson* by amending section 1981 to state as follows:

> For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C.A. § 1981(b) (West Supp.1992). A stated purpose of the 1991 Act is "to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes." Pub.L. No. 102–166, § 3(4), 105 Stat. 1071 (1991). Although Blanding's claim arose prior to the effective date of the 1991 Act, he argues that the 1991 Act should be applied retroactively.

I recently analyzed the issue of whether the 1991 Act applies retroactively. *Aiken v. Bucks Ass'n for Retarded Citizens, Inc.*, 799 F.Supp. 522 (E.D.Pa.1992). After reviewing the language of the 1991 Act, the legislative history, and case law on retroactivity, I concluded that the 1991 Act does not apply to claims based on conduct predating the effective date of the 1991 Act.[2] Having surveyed the cases in this Circuit issued since my decision in *Aiken*,[3] I am persuaded of no different conclusion.

Blanding "concedes that if the [1991 Act] does not apply retroactively to this case, then he is precluded from arguing that his rights under 42 U.S.C. § 1981 were violated." Blanding's Response to Defendants' Motion for Summary Judgment (Document No. 17), at 17.[4] Because I have found that the 1991 Act does not apply retroactively, I conclude that Blanding cannot successfully maintain an action under section 1981 as a matter of law. Accordingly, judgment will be entered in favor of Marakovits on Blanding's claim of discrimination in violation of section 1981 (Count II).

### C. *Blanding's § 1983 Claim*

In Count III of his complaint, Blanding alleges that Sharpe violated his Fourteenth

---

**2.** Although the Court of Appeals for the Third Circuit has yet to address the issue of retroactive application of the 1991 Act, four circuit courts of appeals have examined the question, each concluding that the Act should not be applied retroactively. *See Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363 (5th Cir.1992); *Rush v. McDonald's Corp.*, 966 F.2d 1104 (7th Cir.1992); *Huey v. Sullivan*, 971 F.2d 1362 (8th Cir.1992); *Vogel v. The City of Cincinnati*, 959 F.2d 594 (6th Cir.1992). In addition, the great majority of decisions from the district courts comprising the Third Circuit have come to the same conclusion. *See Parker v. DPCE, Inc.*, No. 91–4829, 1992 U.S.Dist. LEXIS 16921 (E.D.Pa. Nov. 4, 1992); *Crumley v. Delaware State College*, 797 F.Supp. 341 (D.Del.1992); *Thomas v. Frank, U.S. Postmaster General*, 791 F.Supp. 470 (D.N.J. 1992); *Tyree v. Riley*, 783 F.Supp. 877 (D.N.J. 1992); *Futch v. Stone*, 782 F.Supp. 284 (M.D.Pa. 1992). *But see Klaus v. Duquesne Light Company*, 1992 WL 189390, 1992 U.S.Dist. LEXIS 7886 (W.D.Pa. March 11, 1992); *Sample v. Keystone Carbon Co.*, 786 F.Supp. 527 (W.D.Pa.1992); *Thakkar v. Provident Nat'l Bank*, 1991 WL 274827, 1991 U.S.Dist. LEXIS 18753 (E.D.Pa. Dec. 17, 1991).

**3.** *See Parker v. DPCE, Inc.*, 1992 U.S.Dist. LEXIS 16921 (E.D.Pa. Nov. 4, 1992); *Graham v. State Farm Mut. Automobile Ins. Co.*, 1992 WL 334024, 1992 U.S.Dist. LEXIS 16817 (E.D.Pa. Oct. 26, 1992); *Heist v. U.S. Postal Service*, 1992 WL 189394, 1992 U.S.Dist. LEXIS 11457 (E.D.Pa. Aug. 3, 1992); *Core v. Guest Quarters Hotel/Beacon Hotel Corp.*, 1992 WL 189405, 1992 U.S.Dist. LEXIS 11158 (E.D.Pa.1992).

**4.** Blanding does not argue that, if the 1991 Act does not apply retroactively, his complaint still survives *Patterson* because his transformation from a "probationary trooper" to a "trooper" qualifies as the making of a new contract. In other words, Blanding does not claim that as a "trooper" he would have entered into "a new and distinct" relationship with the PSP, thus qualifying his dismissal as interference with the making of a contract. *Patterson*, 491 U.S. at 185, 109 S.Ct. at 2377. Recently, the Honorable E. Mac Troutman of this Court found that "a state trooper who completes the probationary period does not undergo so substantial a change in position that a new and distinct relationship with the employer is created. Thus, discharge prior to the end of the probationary period is not actionable under § 1981." *Jones v. Pennsylvania State Police*, No. 89–6001, Order dated June 13, 1991 (E.D.Pa.). I agree with Judge Troutman, and, if called upon, I would find that Blanding's section 1981 claim does not survive the limitations of *Patterson*.

Amendment right to procedural due process when he dismissed Blanding from the PSP without a hearing. Count III is brought pursuant to 42 U.S.C. § 1983.

It is undisputed that Blanding was not afforded a hearing either before or after the termination of his employment. Sharpe, however, argues that he did not violate Blanding's right to procedural due process because Blanding did not have a "property interest" in his probationary employment.

It is well settled that the procedural due process protections of the Fourteenth Amendment apply only to deprivations of property interests, the existence of which are created and "defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). To have a property interest in his position as a probationary trooper, Blanding must "have more than an abstract need or desire for it[,] ... [h]e must have a legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. at 2709. To demonstrate that he had a property interest in his job as a probationary trooper, Blanding points to section 205(f) of the Administrative Code of Pennsylvania which provides as follows:

> All new cadets and troopers shall serve a probationary period of eighteen months from the date of original enlistment, during which time they may be dismissed by the Commissioner for violations of rules and regulations, incompetency, and inefficiency without action of a court martial board or the right of appeal to a civil court.

71 P.S. § 65(f).

■ Whether a public employee has a property interest in continued employment is a question of state law. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). The Supreme Court of Pennsylvania has not determined whether Section 205(f) creates a property interest in employment with the PSP. Therefore, I must predict how the Pennsylvania Supreme Court would decide. *McKenna v. Ortho Pharmaceutical Corp.*,

622 F.2d 657, 661 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). In making this prediction, decisions of lower courts are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Nationwide Mut. Ins. Co. v. Hampton*, 935 F.2d 578 (3d Cir.1991) (quoting *West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940)).

■ The Commonwealth Court of Pennsylvania has twice addressed the issue of whether Section 205(f) grants probationary troopers a property interest in their job. *Sweeting v. Commonwealth, Pennsylvania State Police*, 95 Pa.Cmwlth. 45, 503 A.2d 1126 (1986); *Marino v. Commonwealth, Pennsylvania State Police*, 87 Pa. Cmwlth. 40, 486 A.2d 1033 (1985). In *Sweeting*, the Commonwealth Court found that a probationary trooper did not have a property interest in continued employment with the PSP. *Sweeting*, 503 A.2d at 1128. This finding was made after an analysis of the relevant legislation and upon a conclusion that such legislation contained none of the limiting language required to create a property interest. *Id.* The Court in *Sweeting* pointed to Section 205(e) of the Administrative Code which states that:

> No enlisted member of the Pennsylvania State Police shall be dismissed from service or reduced in rank except by action of a court martial board held upon the recommendation of the Commissioner of the Pennsylvania State Police and the Governor.

71 P.S. § 65(e). An "enlisted member" is defined as one with eighteen months of service, *i.e.*, a non-probationary trooper. 71 P.S. § 251(b)(4). When contrasting the procedure afforded to enlisted members with that provided to probationary troopers, the Court concluded that the Pennsylvania legislature did not intend to confer a property right upon probationary troopers. *Sweeting*, 503 A.2d at 1128. The same conclusion was reached in *Marino*, where the court stated:

> Petitioners claim that they possess a property right to continued public em-

ployment and that the termination of their employment without a hearing is a violation of due process. We disagree.

.   .   .   .   .

State Police employees who are not on probation are entitled to a hearing with counsel before the Court–Martial Board, the opportunity to present witnesses, to receive findings of fact and proposed conclusions of law, and to have these proceedings transcribed before they can be dismissed.

These widely divergent procedures indicate that the legislature wished to allow enlisted members a hearing before the Court–Martial Board and did not wish to afford new cadets and troopers this opportunity to be heard.

*Marino,* 486 A.2d at 1034 (footnotes omitted).

In support of his argument that Section 205(f) does create a property interest in probationary employment with the PSP, Blanding cites to a recent opinion by the Honorable Clifford Scott Green of this Court. *Small v. Pennsylvania State Police,* No. 84–2310, 1990 WL 52560, 1990 U.S.Dist. LEXIS 4837 (E.D.Pa. April 23, 1990). In *Small,* Judge Green found that although Section 205(f) does not require a hearing prior to dismissing a probationary trooper, it does expressly authorize only three grounds for dismissal. *Id.,* 1990 WL 52560 at *2, 1990 U.S.Dist. LEXIS 4837 at *5. Judge Green, therefore, predicted that the Pennsylvania Supreme Court would decide that the General Assembly intended Section 205(f) to create a property interest in probationary employment with the PSP. *Id.* Judge Green distinguished *Sweeting* and *Marino* by saying that "the Commonwealth Court recognized a property interest in PSP probationary employment as created by Section 205(f) but merely denied to the probationary officers the court martial procedures set forth in Section 205(e)." *Id.* at *7; *see also Bolden v. Pennsylvania State Police,* 371 F.Supp. 1096 (E.D.Pa. 1974).

I respectfully disagree with Judge Green's holding in *Small.* I read *Sweeting* and *Marino* to clearly hold that Section 205(f) does not create a property interest which calls into play the protections of the due process clause. Although I am not bound by these holdings, I am persuaded by their reasoning.

■ The mere fact that the legislature saw fit to list some reasons why a probationary employee "may be dismissed" does not reveal an intention to make the list exhaustive. The hallmark of a constitutionally protected property interest in public employment is the requirement that the employee can only be removed "for cause." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Richardson v. Felix,* 856 F.2d 505, 509 (3d Cir.1988). In *Perri v. Aytch,* 724 F.2d 362 (3d Cir.1983), for example, the Court of Appeals for the Third Circuit held that the pertinent regulations created a property interest in probationary employment. The Court explained:

Although probationary employment is commonly at the will of the employer, in this instance the regulations fixed probationary employment for a period of six months and specifically provided that dismissal during the probationary period be 'for just cause only.'

*Id.* at 365; *see also Patrick v. Miller,* 953 F.2d 1240, 1245 (10th Cir.1992) (property interest found where relevant ordinance read: "removals shall be made on the basis of merit and fitness alone."); *Wheaton v. Webb–Petett,* 931 F.2d 613, 616–17 (9th Cir. 1991) (property interest found where public employee "cannot be removed unless 'unable or unwilling to fully and faithfully perform the duties of the position satisfactorily.'") *Abraham v. Pekarski,* 728 F.2d 167 (3d Cir.), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984) (property interest found where relevant ordinance read: "no person shall be discharged without just cause."). Section 205(f), however, does not contain such mandatory or limiting language.

Without more evidence of the General Assembly's intent to create a property interest in probationary employment with the PSP, the fact that the initial eighteen months of PSP employment are identified

as "probationary" indicates the opposite. Indeed, the Statutory Construction Act of Pennsylvania provides that where the legislature does not indicate otherwise, words and phrases shall be construed "according to their common and approved usage." 1 Pa.C.S. § 1903(a) (Purdon Supp.1992). In common usage, the term "probationary" means being "tested during a trial period." Webster's Ninth New Collegiate Dictionary, at 937 (1990). The very nature of the probationary period is to give the employer the opportunity to weed out those who are unfit for the job. Given this purpose, and the lack of any clear language to the contrary, it appears that the legislature did not intend to create a property interest in probationary employment.

Furthermore, by granting probationary troopers no right to appeal their dismissal, the legislature reinforced the notion that Section 205(f) creates no guarantee of continued employment with the PSP. The Statutory Construction Act provides that it is presumed that the General Assembly does not intend to violate the Constitutions of the United States or Pennsylvania. 1 Pa.C.S. § 1922(4) (Purdon Supp.1992). It is clear that dismissing a public employee without a hearing would violate the due process requirements of the Fourteenth Amendment if the employee has a property interest in continued employment. *Roth*, 408 U.S. at 569–70, 92 S.Ct. at 2705. Therefore, I should presume that the legislature did not intend Section 205(f) to both confer a property interest in probationary employment with the PSP and to deny probationary troopers a hearing before depriving them of that interest.[5]

Because I am not convinced that the Pennsylvania Supreme Court would disagree with the Pennsylvania Commonwealth Court, I will follow the holdings in *Sweeting* and *Marino*. I conclude, therefore, that the General Assembly did not intend to create a property interest in probationary employment with the PSP when it enacted Section 205(f). Accordingly, judgment will be entered in favor of Sharpe

on Blanding's section 1983 claim that Sharpe violated his right to procedural due process when he dismissed Blanding from the PSP without a hearing (Count III).

## D. *Blanding's Title VII Claim*

▆▆▆▆ Blanding's remaining claim is against the PSP for racial discrimination in violation of Title VII. To withstand a motion for summary judgment under Title VII, the plaintiff has the burden to show a *prima facie* case of discrimination. *Patterson*, 491 U.S. at 186, 109 S.Ct. at 2377 (citing *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093). Absent direct evidence of discrimination, the plaintiff may prove intent through the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The framework provides that the plaintiff may demonstrate a *prima facie* case by showing that (1) he is a member of a protected class, (2) he was qualified for the job from which he was discharged, and (3) others not in the protected class were retained. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *see also Hankins v. Temple University*, 829 F.2d 437, 440 (3d Cir.1987). The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for discharging the plaintiff. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The defendant's burden is not one of persuasion, but only production of evidence logically supporting a reason for the dismissal. *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094; *Bellissimo v. Westinghouse Elec. Corp.*, 764 F.2d 175, 179 (3d Cir.1985), *cert. denied*, 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986).

▆▆▆▆ Once the defendant has articulated a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to show by a preponderance of the evidence

---

5. The General Assembly is presumed to act with full knowledge of due process requirements. *McKnight v. Southeastern Pennsylvania Transp.*

*Authority*, 438 F.Supp. 813, 821 (E.D.Pa.1977), *rev'd on other grounds*, 583 F.2d 1229 (3d Cir. 1978).

that the defendant's stated reason is a pretext for discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The task of the court at the summary judgment stage is to determine whether the evidence offered by the plaintiff establishes a reasonable inference that the PSP's proffered reason for dismissing Blanding was pretextual such that there remains a genuine issue of material fact for trial. *Weldon v. Kraft, Inc.,* 896 F.2d 793, 800 (3d Cir.1990). The plaintiff may establish pretext by either direct evidence of discrimination or by indirect or circumstantial evidence that the proffered reason is without credence. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 900 (3d Cir.) (en banc), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). The plaintiff may not, however, simply cast doubt on the defendant's articulated reasons or merely restate his *prima facie* case. *Id.* Furthermore, even though an employee may disagree with the employer's decisions, it is not for the court to second guess those decisions without evidence from which it could be inferred that race was a determinative factor in the result. *Billet v. CIGNA Corp.,* 940 F.2d 812, 817 (3d Cir.1991); *see also McFall v. Frank,* No. 89–4678, 1992 WL 74168, 1992 U.S.Dist. LEXIS 3724 (E.D.Pa. March 27, 1992).

▄▄▄ Without explaining its reasons, the PSP has conceded that Blanding has satisfactorily made out a *prima facie* case of racial discrimination in accordance with the *McDonnell Douglas* framework discussed above. However, the PSP argues that it has articulated a legitimate, non-discriminatory reason for Blanding's dismissal.

Blanding claims that he was disciplined more harshly than he deserved because of his race.[6] He points to the cases of two white troopers, Trooper John J. Snyder ("Snyder") and Rickie L. Pendergrass ("Pendergrass"), who committed infractions similar to his. *See* Deposition of Blanding, attached to Defendants' Motion

for Summary Judgment as Exhibit B, at 158–60 (hereinafter the "Blanding Deposition").

Snyder enlisted in the PSP on June 25, 1970. As a full-fledged trooper, Snyder was investigated by the BPR for allegedly pointing a gun at his wife while intoxicated on February 8, 1986. No criminal charges were ever brought against him. Rostalski imposed a penalty of five (5) days suspension without pay on Snyder for his actions. Pendergrass enlisted in the PSP on July 20, 1981. Also as a full-fledged trooper, Pendergrass was investigated by the BPR for an incident which occurred on March 5, 1985. Pendergrass was attempting to question a witness as part of on ongoing criminal investigation. The witness refused to answer any of Pendergrass' questions or to allow him into her residence, so he broke the window in a door of her home, reached through to unlock the door, and let himself in. No criminal charges were ever brought against Pendergrass. Rostalski imposed a penalty of fifteen (15) days suspension without pay on Pendergrass for his actions.

According to the PSP, the discipline dispensed to Snyder and Pendergrass is not reflective of racial preference, but of a policy that discipline is traditionally dispensed more harshly to probationary troopers than to full-fledged troopers. The PSP claims that it is "interested in keeping tight reins on [probationary troopers] and weeding them out, dismissing them if necessary, before they become a liability to the organization." Declaration of Richard C. Mooney (dated Aug. 3, 1992), attached to Defendants' Motion for Summary Judgment as Exhibit G, at paragraph 9.

I am satisfied that the PSP has properly articulated a legitimate, non-discriminatory reason for dismissing Blanding. The undisputed facts surrounding the investigation and findings of Werts in his DAR, the actions of Rostalski and Sharpe set forth above in this memorandum at "I. Factual

---

6. Blanding does *not* claim that black officers in the Bethlehem Troop are subjected to BPR investigations more often than white officers. Likewise, Blanding does *not* allege that black officers in the Bethlehem Troop are found in violation of internal regulations more often than white officers.

Background," as well as the PSP's explanation of its reasons for the discipline given to troopers Snyder and Pendergrass meet the defendants' burden of production in this regard. Thus, it is Blanding's obligation to produce evidence from which a reasonable trier of fact could infer that the allegedly legitimate reason proffered for his dismissal was only a pretext for discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. Essentially Blanding offers the following evidentiary arguments in support of his position that the PSP's reason is pretextual: (1) Blanding testified at his deposition that he detected personal animosity from Marakovits' facial expressions, tone of voice, accusatory questioning, and repeated interrogations after Marakovits learned that Blanding's former girlfriend, Serafine, is white, and (2) Blanding testified at his deposition that Marakovits' GI contained several errors and gave no credence to Blanding's version. Blanding argues that because Rostalski stated that his recommendation to dismiss Blanding was based upon information contained in the GI and the DAR, Marakovits discriminatory conduct was the cause of his dismissal.[7]

■ After careful review of the record, I conclude that Blanding has failed to meet his final burden to show that a reasonable trier of fact could infer that the PSP's proffered reason for dismissing Blanding is a pretext for discrimination. The only evidence Blanding has produced is his deposition testimony wherein he states his belief that Marakovits did not approve of his relationship with Serafine, and, as a result, included false statements in the GI. It is not true "that a discrimination plaintiff must offer 'some evidence other than [his] or her own subjective belief'" to survive a motion for summary judgment. *Jackson v. University of Pittsburgh*, 826 F.2d 230, 236 (3d Cir.1987), *cert. denied*, 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988). However, it is also not true that a plaintiff may reach a trier of fact with mere barebone allegations. *Lujan*, 497 U.S. at 886–888, 110 S.Ct. at 3188 (a nonmoving party

may not successfully oppose a summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

In *Jackson*, the Court of Appeals for the Third Circuit found that the plaintiff's deposition testimony contained both circumstantial and direct evidence from which a trier of fact could reasonably infer that the defendants' reason for dismissing him was pretextual. *Jackson*, 826 F.2d at 236. In that case, however, the plaintiff's deposition testimony contained much more than simple accusations and speculation. Throughout 700 transcript pages, the plaintiff called into serious question the defendants' claims that he was dismissed for performance deficiencies. *Id.* at 234–35. Contrary to the defendants' claims, the plaintiff in *Jackson* stated that he never received complaints about his work and, in fact, was complemented for his work. *Id.* at 234. He also testified that one of the defendants had mentioned to plaintiff's attorney that he would "ruin [the plaintiff's] reputation and destroy [him]." *Id.* at 234. Finally, the plaintiff testified that after dismissing him, the defendants began soliciting complaints from other employees about the plaintiff's work to justify their action. *Id.*

In *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir.1990), the Third Circuit reiterated its holding in *Jackson* by stating that it does not agree that "uncorroborated deposition testimony is insufficient to create a genuine issue on the question of discriminatory intent." The plaintiff in *Weldon* testified at his deposition that, as a trainee, he was assigned to a supervisor who had a history of difficulty with blacks. *Id.* at 799. He claimed the supervisor treated him more harshly than other trainees, and, as a result, his performance evaluations were unfair. The plaintiff also stated that he learned, through conversations with other black trainees, that his situation was not unique. *Id.* Also, he pointed to statistical evidence regarding the termination by the

---

**7.** It appears from the record that Blanding agrees that Rostalski was the ultimate decision-

maker. *See* Blanding's Response to the Defendants' Motion for Summary Judgment, at 19.

defendant of minority employees and white employees which supported an inference that the reason for his dismissal was pretextual. *Id.* Considering the quantity and reliability of the circumstantial evidence to which the plaintiff referred, the Court found that his deposition testimony was sufficient to survive a motion for summary judgment. *Id.* at 799–800.

In contrast to both *Jackson* and *Weldon,* Blanding's deposition testimony contains simple accusations which merely restate his *prima facie* case. Blanding claims that Marakovits expressed surprise and displeasure after he learned of Blanding's relationship with a white woman. Blanding felt that Marakovits' style of interrogation was a result of Marakovits' feelings of racial prejudice. Also, Blanding claims that Marakovits included false facts in the GI with discriminatory intent.

Even if it were true that Marakovits disapproved of Blanding's relationship with Serafine, the only possible connection Blanding has shown between Marakovits' feelings and Rostalski's ultimate decision to dismiss Blanding is the GI.[8] However, the falsities Blanding points to in the GI are relatively inconsequential. *See supra,* at 1087–88. Indeed, Blanding's version of the events in his own words was attached to the GI in the form of Blanding's two separate written statements. Therefore, Rostalski had the full record before him and the opportunity to believe Blanding's version of the events. Instead, Rostalski found Serafine's version more credible. However, in cases of alleged racial discrimination, the issue is not whether employment decisions are fair or wise, but only whether they are improperly based on race. *Billet,* 940 F.2d at 817; *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 n. 6 (1d Cir.1979). Therefore, Blanding must show that a reasonable trier of fact could find that Rostalski made his decision to dismiss Blanding with discriminatory intent.

Blanding claims that if he were white, he would not have been dismissed. However, he offers no names or specific information in support of his allegation. As discussed above, Blanding does refer in his deposition testimony to two white troopers, Snyder and Pendergrass, who were suspended but not dismissed for violations arguably similar to Blanding's. Both Snyder and Pendergrass, however, were non-probationary, full-fledged troopers. Blanding can identify no probationary trooper with infractions similar to his who was disciplined more leniently. When asked at his deposition whether he knew or had heard of any troopers besides Snyder and Pendergrass who were accused or convicted of violations similar to his, Blanding responded: "None that I know of." Deposition of Blanding, at 160–59. Also, Blanding produced no statistical evidence which may help to support an inference that the PSP's reason for dismissing him was a pretext for discrimination. *See, e.g., Weldon,* 896 F.2d at 799. Although I am mindful of the fact that I cannot substitute my legal judgment at this stage for the factfinding process to which Blanding claims he is entitled, I am duty bound to consider whether Blanding has produced sufficient evidence from which a trier of fact could do more than speculate. The record before me, however, contains only Blanding's conclusory accusations as to the cause of his dismissal.

To establish a genuine issue of fact that defeats a motion for summary judgment, Blanding must "do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Electric Industry Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e) in part) (emphasis is the Court's). Because I find that Blanding has not shown sufficient evidence from which a reasonable trier of fact could infer that Marakovits' personal feelings or the alleged discrepancies in the GI had any impact on Rostalski's decision to dismiss Blanding, I conclude that the PSP is enti-

---

**8.** Blanding does not claim that Rostalski intended to discriminate against Blanding because of his race.

tled to judgment as a matter of law on Blanding's Title VII claim.

## III.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment will be granted, and plaintiff's motion for summary judgment will be denied.