Wesley M. SMITH, Plaintiff,

v.

CHEVRON USA, INC., Defendant.

No. 93–CV–3263.

United States District Court, E.D. Pennsylvania.

Feb. 16, 1995.

---

Sheldon Tabb, Elkins Park, PA, for plaintiff.

Phinorice J. Boldin–Dixon, Lloyd S. Markind, Arnelle & Hastie, Philadelphia, PA, for defendant.

### DECISION

JOYNER, District Judge.

This Title VII case was tried before this Court in a non-jury trial on November 7–9, 1994. The plaintiff is Wesley Smith, a black male who alleges that he was terminated by the defendant, Chevron, USA ("Chevron"), on account of his race. The parties have submitted their proposed findings of fact and conclusions of law and the matter is now ripe for decision. Accordingly, the Court makes the following factual findings and legal conclusions.

### FINDINGS OF FACT

#### A. *Background*

1. In 1974, Mr. Smith was hired by the Gulf Oil Company and worked at its refinery in South Philadelphia, Pennsylvania. (Tr., Vol. I, pp. 13–14).

2. In 1986, Chevron purchased the refinery from Gulf. Most of Gulf's employees, including Mr. Smith, were retained by Chevron. (Tr., Vol. I, pp. 8–10).

3. From July 1, 1986 until he was terminated on November 25, 1991, Mr. Smith worked for Chevron in the blending and shipping department of the refinery. (Tr., Vol. I, p. 13).

#### B. *Mr. Smith's Duties*

4. Mr. Smith worked as a pumper and an operator while employed by Chevron. In these capacities, Mr. Smith was charged with monitoring the flow of oils and other petroleum products to and from tanks and vessels, as well as lining up piping to facilitate these transfers, in accordance with the wishes of his supervisors. (Tr., Vol. III, p. 42).

5. The task of monitoring product flow required the operator to measure and record the levels of the various tanks to ensure that overfills did not occur. Generally, the process of measuring tank levels entailed reading the gauges on the tank. (Tr., Vol. II, p. 133).

6. Overfills could result in the spill of petroleum product onto the ground, or the release of vapors into the air, which could result in environmental and personal harm. (Tr., Vol. I, p. 44).

7. Operators were required to hand gauge a tank if the tank was filled to within five feet of its maximum safe capacity or if the operator had reason to believe that the gauges were not working properly (e.g., if the operator knew a tank was either being filled or emptied and that activity was not reflected in the gauge reading). (Tr., Vol. II, p. 134).

### C. *Mr. Smith's Performance Evaluations*

8. Chevron required that its employees receive a performance evaluation at least every two years, although supervisors were permitted to issue evaluations annually if they so desired. (Tr., Vol. I, p. 29).

9. For the period ending in October, 1987, Mr. Smith received an evaluation in the "middle range of performance," which was the evaluation received by most employees. (Tr., Vol. I, p. 30).

10. For the periods ending in October, 1988 and October, 1989, Mr. Smith again received evaluations in the "middle range of performance." (Tr., Vol. I, pp. 31–33).

11. For the period ending in October, 1990, Mr. Smith's evaluation fell to that of "minimum acceptable performance." (Tr., Vol. I, p. 34).

### D. *Disciplinary System*

12. Chevron employed a progressive disciplinary system to respond to employee negligence and misconduct. (Tr., Vol. II, p. 105).

13. Thus, an employee would receive punishments of increasing severity for successive infractions of company policy. (Tr., Vol. II, p. 105).

14. These punishments included oral warnings, written warnings, suspensions, and termination. (Tr., Vol. II, p. 105).

15. Punishments were meted out according to the severity of the event and the responsible individual's disciplinary history. (Tr., Vol. I, p. 46).

### E. *Events Leading to Mr. Smith's Termination*

16. Mr. Smith was terminated on November 25, 1991, ten days after a tank that he was charged with monitoring overfilled. (Tr., Vol. II, p. 166). Prior to this incident, Mr. Smith had been disciplined several times for various infractions of company policy. These incidents are detailed below.

#### *The first incident*

17. The first such time occurred on June 15, 1985, while the refinery was still operated by Gulf. On that day, Mr. Smith was assigned the task of lining up piping to facilitate the transfer of heavy naphtha, a petroleum product, from one tank to another. (Tr., Vol. I, pp. 75–76).

18. Some time later, Mr. Smith's supervisor discovered that the heavy naphtha had become contaminated with another product. After an investigation, the supervisor determined that the contamination had occurred because Mr. Smith had failed to perform the line-up properly. (Tr., Vol. II, p. 110).

19. As a result of Mr. Smith's error, the product was unfit for shipment as scheduled. (Tr., Vol. II, pp. 108–09).

20. Mr. Smith explained by stating that he had not received sufficient training to accomplish this task, but he accepted full responsibility for this mistake. (Tr., Vol. I, p. 76).

21. Mr. Smith received an oral warning as a result of this mishap. (Tr., Vol. II, p. 110).

#### *The second incident*

22. The next day, June 16, 1985, Mr. Smith was again tasked with lining up piping to facilitate the transfer of a petroleum product from one tank to another. Mr. Smith delegated this task to his assistant, a black man named Harry Booker. (Tr., Vol. I, p. 76, 124).

23. Once again, the product became contaminated because the job had not been properly aligned. (Tr., Vol. II, p. 110).

24. Mr. Smith's error caused an upset in one of the refinery's units. (Tr., Vol. II, p. 110).

25. Mr. Smith was disciplined by means of a written warning which informed him that continued unsatisfactory work performance or violations of company policy would result in further discipline in the form of time off or discharge. (Tr., Vol. I, p. 76; Vol. II, pp. 110–11).

#### *The third incident*

26. On May 31, 1986, Mr. Smith was assigned the task of completing a monthly inventory report. Mr. Smith delegated this task to Mr. Booker. (Tr., Vol. I, p. 82).

27. Some time later, it became clear that the information in the monthly inventory report was erroneous. (Tr., Vol. II, pp. 111–12).

28. As a result of this incident, the inventory figures for the entire month were inaccurate and of no use. Hours of work were required to correct the inventory figures. (Tr., Vol. II, pp. 111–12).

29. Mr. Smith received a two-day suspension as a result of this incident. Mr. Booker was not disciplined. (Tr., Vol. I, p. 82; Vol. II, pp. 111–12).

*The fourth incident*

30. On April 15, 1988, Mr. Smith was assigned the task of monitoring the flow of various petroleum products in and out of a number of tanks, including tank number 494. (Tr., Vol. I, p. 78).

31. Shortly before midnight on April 15, Mr. Smith read and recorded the level of product in tank 494, a tank with a maximum safe level of 27 and ½ feet. The gauge indicated that level of product in the tank was 28 feet. (Tr., Vol. II, p. 79).

32. Mr. Smith failed to take any action to address the situation. (Tr., Vol. I, p. 86).

33. At midnight, Mr. Smith turned his records in to his supervisor, a white man named William McVean. Mr. McVean also failed to take any corrective measures. (Tr., Vol. I, p. 79; Vol. III, p. 26).

34. At 5:15 A.M. on April 16, 1988, Mr. Smith discovered that tank 494 had overfilled. The evidence revealed that the tank began to overfill two to three hours before Mr. Smith discovered the spill. (Tr., Vol. III, p. 85).

35. As a result of Mr. Smith's inattention, over 80,000 gallons of petroleum product had spilled onto the ground, creating a significant risk of environmental and personal harm. (Tr., Vol. III, pp. 85–86).

36. As a result, Mr. Smith was suspended for four days. Mr. McVean received a written warning. (Tr., Vol. III, p. 25, 27–28).

37. The disparity in disciplinary measures was due to Mr. Smith's more extensive disciplinary history. (Tr., Vol. III, p. 25–26).

*The fifth incident*

38. On June 21, 1990, Mr. Smith was charged with lining up piping to effectuate a transfer of heavy naphtha from a tank to a barge. (Tr., Vol. I, 144–45).

39. Mr. Smith was aware that contamination of heavy naphtha by another product could render it useless. (Tr., Vol. I, pp. 146–47).

40. Some time after Mr. Smith lined up the job, his supervisor became aware the heavy naphtha had become contaminated with another petroleum product. (Tr., Vol. I, p. 149).

41. Mr. Smith complained that Joseph Knisely, a white employee who worked on the previous shift, had left a valve open that was normally closed. It was, however, Mr. Smith's duty to ensure that the piping was properly aligned. (Tr., Vol. I, pp. 147, 149–50).

42. Mr. Smith received a five day suspension, while the white employee was not disciplined. (Tr., Vol. I, p. 152).

*The final incident*

43. On November 14, 1991, Mr. Smith was charged with monitoring the flow of petroleum products to and from various tanks, including tank number 292. (Tr., Vol. I, p. 152).

44. When Mr. Smith assumed the watch from Mr. Knisely at 6:00 PM on November 14, he was or should have been aware that tank 292 had been filling since 7:30 that morning. The records indicate that although the tank was filling, an increase in the tank's level was not reflected in the gauge readings during Mr. Knisely's watch. (Tr., Vol. I, pp. 153–55).

45. At 7:17 P.M, Mr. Smith read and recorded the gauge on tank 292, noting that the tank level remained constant. (Tr., Vol. I, p. 160, 168).

46. At 11:50 P.M., Mr. Smith read the gauge and recorded a level which again indicated that no appreciable increase in the tank's level was registering on the gauge. Mr. Smith failed to hand gauge the tank or

take any other corrective measures. (Tr., Vol. I, p. 160, 170).

47. At 3:45 A.M. on November 15, other employees noticed that the tank had overfilled. After an investigation, it was determined that the overfill was due largely to Mr. Smith's inattention to his duties and responsibilities. (Tr., Vol. II, p. 153–54).

48. As a result of Mr. Smith's inattention, approximately 17,000 gallons of hydrocarbon filled the field. The Chevron fire brigade responded and foam was deployed to reduce the chance of an ignition. (Tr., Vol. II, pp. 136–37, 162).

49. Downwind from the spill, hydrocarbon levels exceeding the lower explosive level were detected, although no explosion resulted. (Tr., Vol. II, p. 162).

50. High levels of benzene, a toxin, were detected in the air, such that persons in the area were required to wear respiratory equipment. Eleven persons were exposed to the high benzene levels without respiratory equipment. (Tr., Vol. II, p. 138, 162).

51. Vacuum trucks were called in to respond to the spill from outside the refinery. The trucks were used to clean up the spilled product and reduce the risk of an explosion and fire. (Tr., Vol. II, p. 142–43).

52. Environmental damage resulted from the spill. The soil surrounding the tank had become contaminated with benzene and had to be removed and disposed of. (Tr., Vol. II, p. 194).

53. Clean up efforts continued for several weeks, and environmental concerns were not fully resolved until three to four months after the spill. (Tr., Vol. II, p. 194–95).

54. Mr. Smith was terminated as a result of this incident. Mr. Knisely received a written warning. (Tr., Vol. I, p. 102).

55. Mr. Smith's termination was brought on by his repeated violations of company policy. Mr. Smith was not terminated on account of his race. (Tr., Vol. II, 163–66).

F. *Other Overfills*

56. Mr. Smith offered evidence to indicate that a number of other employees had been involved in overfills and received forms of punishment less severe than dismissal.

57. On September 12, 1991, a white operator caused an overfill and was punished with a one-day suspension. (Tr., Vol. I, pp. 113–14).

58. On August 17, a white employee caused an overfill and was subsequently give a one day suspension. (Tr., Vol. I, p. 114).

59. In February of 1991, an African American employee was involved in an overflow and received a one day suspension. (Tr., Vol. I, p. 112).

60. The plaintiff failed to offer any evidence that any of these employees, black or white, had a disciplinary history as extensive as Mr. Smith's.

### DISCUSSION

■ The complaint alleges that Mr. Smith was unlawfully terminated on account of his race in violation of both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Title VII makes it unlawful to discharge an employee on account of his race, 42 U.S.C. § 2000e–2(a)(1), while § 1981 prohibits discrimination in the making and enforcing of contracts. *Butler v. Elwyn Inst.*, 765 F.Supp. 243, 247–48 (E.D.Pa.1991). To prevail on a disparate treatment claim under either Title VII or § 1981, a plaintiff must demonstrate purposeful discrimination. *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3d Cir.1990). In the absence of direct evidence, discriminatory intent may be proved under the analysis provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Thus, to make out a prima facie, Mr. Smith bears the burden of showing, by a preponderance of the evidence, that (1) he was a member of a protected class; (2) he was qualified for the job from which he was discharged; and (3) others not in the protected class were retained. *Blanding v. Pennsylvania State Police*, 811 F.Supp. 1084, 1093 (E.D.Pa.1992) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824), *aff'd*, 12 F.3d 1303 (3d Cir.1993); *Butler*, 765 F.Supp. at 246.

■ If a plaintiff succeeds in making out his prima facie case, the burden shifts to the

defendant to articulate some legitimate, non-discriminatory rationale for discharging the plaintiff. *Weldon,* 896 F.2d at 797; *Butler,* 765 F.Supp. at 246. Once the defendant makes this showing, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's stated reason is a pretext for discrimination. *Blanding,* 811 F.Supp. at 1093–94. The plaintiff can either prove this directly, by making a showing that racial considerations motivated the defendant's actions, or indirectly, by showing that the rationale provided by the defendant is not credible. *Weldon,* 896 F.2d at 797.

Turning to the instant matter, we first conclude that Mr. Smith has successfully set forth a prima facie case. In making this conclusion, we note that Mr. Smith's burden in this regard "is not onerous." *Id.* It is enough if the evidence raises the inference of discrimination. Thus, we conclude first that Mr. Smith, as an African–American man, is a member of a protected class. Further, we conclude that Mr. Smith was qualified for the job from which he was discharged. The evidence shows that Mr. Smith had worked in his position for over 15 years, and that he consistently received performance evaluations reflecting his ability to reach at least the minimum level of proficiency required to accomplish his assigned tasks. Finally, the evidence shows that Mr. Smith was terminated while white employees in his position were retained.

Chevron contends that Mr. Smith was terminated as a result of his continued breaches of company policy, the culmination of which was the spill on the morning of November 15, 1991. Since this explanation is legitimate and nondiscriminatory, the burden rests with Mr. Smith to show that the rationale provided is pretextual. Mr. Smith has presented no evidence in direct support of his theory that he was terminated on racial grounds. Further, Mr. Smith does not contest the basic facts surrounding the incidents for which he was disciplined between 1986 and 1991. Instead, Mr. Smith attempts to meet his burden by arguing that white employees involved in the incidents for which

Mr. Smith was disciplined received more lenient treatment than did Mr. Smith.

The plaintiff points to the fifth incident, in which he was assigned the task of lining up piping to facilitate the transfer of heavy naphtha to a barge. Mr. Smith blames the mishap on Mr. Knisely, who apparently left open a valve on a previous shift, one that is normally kept shut. Mr. Smith notes that while he received a five day suspension, Mr. Knisely received no discipline. The evidence revealed, however, that Mr. Smith alone was charged with ensuring that the line-up had been performed properly so that the transfer would occur without contamination of the heavy naphtha by another product. Proper alignment was important because, as Mr. Smith conceded, contamination of heavy naphtha by another product could render it useless. The mishap occurred on Mr. Smith's watch, while Mr. Knisely was off duty. The evidence further showed that Mr. Smith had been disciplined four times, with progressive severity, in the past. Under these circumstances, we conclude that Mr. Smith received the more severe treatment as a result of his exclusive responsibility to accomplish the task properly, his inattention to his duty, and his extensive disciplinary record, and not because Chevron unlawfully singled out a protected minority for disparate treatment.

Mr. Smith further notes that Mr. Knisely received only a written warning for his role in the November 15, 1991 spill, the incident directly proceeding Mr. Smith's discharge. The evidence demonstrates, however, that the spill occurred on Mr. Smith's watch, hours after Mr. Knisely had been relieved. And while Mr. Knisely may have been delinquent in the performance of his duties, there was little risk of a spill occurring on his watch. Further, and more telling, the evidence shows that Mr. Smith was discharged only after numerous breaches of company policy, that he was disciplined with increasing severity after each incident, and that white employees who were afforded more lenient treatment did not have a disciplinary history as rich as Mr. Smith's.

Mr. Smith makes similar arguments with respect to the other incidents, pointing to

white employees who were involved in the incidents and treated more favorably. In each case, however, the evidence demonstrates that Mr. Smith's involvement and responsibilities were more closely associated with the incidents than were the white employees. Further, the evidence shows that Mr. Smith's disciplinary history was more extensive than the history of the various white employees Mr. Smith selects for comparison. That Mr. Smith received a more severe punishment is quite reasonable, and can hardly be interpreted as a pretext for discrimination. In other words, Mr. Smith failed to point to any employee, white or black, with a similar disciplinary history who was afforded more lenient treatment. Mr. Smith was disciplined fairly and in accordance with the company's procedures. As a result, we conclude that Mr. Smith has failed to prove that he was terminated on account of his race.

Accordingly, we make the following

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter by virtue of 28 U.S.C. § 1331, 42 U.S.C. § 1981, and 42 U.S.C. § 2000e–2(a).

2. Plaintiff has failed to prove by a preponderance of the evidence that he was terminated as a result of racial discrimination.

3. Judgement is entered in favor of Defendant on all counts of Plaintiff's Complaint.