Jackson D. BLANDING, Appellant

v.

PENNSYLVANIA STATE POLICE;
Thomas O. Marakovits; Ronald
M. Sharpe.

No. 93–1049.

United States Court of Appeals,
Third Circuit.

Argued Aug. 2, 1993.

Decided Dec. 30, 1993.

Rehearing Denied Feb. 7, 1994.

Stuart M. Wilder (argued), Newtown, PA, for appellant Jackson D. Blanding.

Harold I. Goodman (argued), Raynes, McCarty, Binder, Ross & Mundy, Sharon M. Dietrich, Community Legal Services, Inc., Philadelphia, PA, for amici curiae Keith Small, et al.

Ernest D. Preate, Jr., Atty. Gen., Denise A. Kuhn (argued), Deputy Atty. Gen., Kate L. Mershimer, Senior Deputy Atty. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Service, Philadelphia, PA, for appellees.

Before: STAPLETON, HUTCHINSON and ROTH, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Jackson Blanding alleges that he was discharged from the Pennsylvania State Police ("PSP") without due process and because of racial animus. He brought this action claiming violation of the Fourteenth Amendment, Title VII, and the Civil Rights Act. After discovery, the defendants moved successfully for summary judgment, 811 F.Supp. 1084. This appeal followed. We will affirm.

### I.

Blanding became a cadet at the PSP Academy on June 29, 1987. After graduating five months later, he was assigned to the Bethlehem Troop where he worked as a probationary trooper until his dismissal from the PSP on December 9, 1988.

Blanding's discharge stemmed from an incident that occurred on June 16, 1988. That evening, Blanding had an argument with his girlfriend, Lisa Serafine, in an apartment they shared in Philadelphia. There are conflicting accounts of what occurred. Serafine says that Blanding physically abused her in the apartment and pointed his loaded revolver at her head. Blanding denies pointing a gun at Serafine and insists that she attempted to kick him in the groin and that he struggled with her in self defense. Ultimately, Serafine left the apartment and Blanding followed her into the street. Some youths came to Serafine's assistance and Blanding told them to mind their own business. A struggle ensued and Blanding knocked one of the youths to the ground. The youths then left but, according to Blanding, said that they would be back "to finish it." Blanding went to his apartment, retrieved his revolver, sat on his front stoop, and awaited the return of the youths. The youths did return and fired five shots at Blanding. Blanding neither identified himself as a state police officer nor called the Philadelphia police for assistance. The Philadelphia Police Department later arrived on the scene and determined that Blanding had not fired his weapon during the incident.

Blanding reported his version of the incident to his supervisor. Because a shooting was involved, Blanding's actions were investigated by Lieutenant Thomas O. Marakovits of the PSP's Bureau of Professional Responsibility ("BPR"). After interviewing Blanding and conducting an investigation, Marakovits prepared a General Investigation Report which included summaries of witness interviews and relevant documents. The report makes no recommendation as to what discipline, if any, Blanding should receive.

Blanding claims that Marakovits' report contains four errors: (1) the account of one of Blanding's interviews incorrectly states that Blanding admitted to having smoked marijuana with Serafine when in fact he admitted only to being present on two occasions when marijuana was being smoked; (2) the assertion that Blanding failed to identify himself as a police officer is false; (3) the statement that Marakovits provided Blanding with the Philadelphia Police Department's report of the incident is incorrect; and (4) the account of a July 6, 1988, interview incorrectly states that Blanding did not mention

Serafine's alleged threat to contact his superiors.[1]

Marakovits' allegedly flawed report was submitted to his supervisor who then forwarded it to Blanding's Troop Commander, Captain Robert G. Werts. Werts prepared a document charging Blanding with violating four sections of the PSP Code of Conduct. This document references the incident of June 16, 1988, but does not summarize the substance of Marakovits' report. After receiving Werts' charging document, Blanding was given an opportunity to rebut orally the charges against him. Blanding was also permitted to make a written response within ten days, and he did so.

The charging document and Marakovits' report were forwarded to the Department Disciplinary Officer, Captain Ronald A. Rostalski, for a decision on the penalty to be imposed. Rostalski decided that a supplemental personal interview of Serafine was desirable. Marakovits traveled to Florida, interviewed Serafine, secured a sworn statement from her, and thereafter submitted a supplemental report.

As Rostalski reviewed the information submitted to him, he was impressed with a discrepancy in Blanding's accounts of the events of June 16. Marakovits reported that Blanding, when asked during his second interview, denied having hit Serafine in the street, but the Philadelphia police report, based on an interview the night of the incident, reported that Blanding admitted to following Serafine outside and striking her in the head. Based on his review of the investigation, Rostalski believed the "course of events" to be:

> That they had an altercation; that he did in fact strike Lisa Serafine; that he did in fact point a revolver at her head; that he did in fact go out to the street and get into an altercation with some of the youths and also hit Lisa Serafine out in the street; that he did in fact sit on the porch with his gun tucked in his belt and waited for some other youths to come at him, and that he

did in fact not call the police as he appropriately should have done.

A–437.

Rostalski recommended to Deputy Commissioner Glenn A. Walp that Blanding be dismissed from the PSP. Walp concurred with Rostalski, and their recommendations were forwarded to Commissioner Ronald M. Sharpe, who ultimately approved Blanding's dismissal.

## II.

■ Sections 205(e) and (f) of the Administrative Code of Pennsylvania provide:

> (e) No enlisted member of the Pennsylvania State Police shall be dismissed from service or reduced in rank except by action of a court martial board held upon the recommendation of the Commissioner of the Pennsylvania State Police and the Governor.

> (f) All new cadets and troopers shall serve a probationary period of eighteen months from date of original enlistment, during which time they may be dismissed by the Commissioner for violations of rules and regulations, incompetency, and inefficiency without action of a court martial board or the right of appeal to a civil court.

71 Pa.Stat.Ann. §§ 65(e)–(f) (1990 & Supp. 1993).

Blanding insists that § 205(f) gave him a property interest in his employment of which he could not be deprived without the due process of law mandated by the Fourteenth Amendment to the United States Constitution. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). Since the district court, in granting summary judgment to the defendants, concluded that Blanding did not have a state conferred property interest that entitled him to due process protection prior to his discharge, Blanding argues that the judgment of the district court must be reversed.

---

1. Blanding's brief mentions an alleged fifth error: "Blanding claimed that he did not go to the residence where he argued with Serafine, in contradiction to Marakovits' report." Appellant's Brief, p. 29. Since Blanding's statement acknowledges going to the apartment on the evening of June 16, 1988, we do not understand this contention.

■ The parties agree that under Fourteenth Amendment law Blanding would have been entitled to notice of the charges against him and a pre-termination hearing if Pennsylvania law mandated that he could be discharged only for cause. They further agree, at least for present purposes, that Blanding did not receive an adequate notice and hearing. Finally, the parties agree that if Blanding was subject to dismissal at the discretion of the Commissioner, no such notice and hearing were required and his due process rights were not violated. The issue for resolution is thus the extent of Blanding's interest in his employment under Pennsylvania law. *See Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976).[2]

More particularly, the proper disposition of Blanding's due process claim turns on how one interprets § 205(f). If the legislature intended that section to provide assurance to probationary troopers that they could be dismissed only for one of the three identified clauses, the process called for by the Due Process Clause has to be given. On the other hand, federal due process is not required if the legislature intended § 205(f) to instruct the Commissioner to treat probationary troopers differently than non-probationary troopers and, at the Commissioner's discretion, to dismiss probationary troopers for such things as violations of the rules, incompetency, and inefficiency, without convening a court martial board.

We must give § 205(f) the reading that we believe the Pennsylvania Supreme Court would give it. Since that court has not interpreted § 205(f), we must look to the decisions of Pennsylvania's intermediate appellate courts and follow the guidance we find there unless there is some reason to believe the Pennsylvania Supreme Court would take a contrary view. *Nationwide Mut. Ins. Co. v. Hampton,* 935 F.2d 578, 580 (3d Cir.1991). Because there are four cases from Pennsylvania Commonwealth Court which interpret § 205(f) in a manner inconsistent with Blanding's position and because we see no reason to believe the Pennsylvania Supreme Court would reject the view there taken, we are constrained to affirm the district court's summary judgment on Blanding's due process claim.

The plaintiffs in *Marino v. Pennsylvania State Police,* 87 Pa.Cmwlth. 40, 486 A.2d 1033 (1985) (in banc), were probationary troopers who had been discharged for allegedly cheating on examinations. Because there was no pre-termination hearing, as the Due Process Clause requires if public employees hold a state law property interest in their employment, the plaintiffs insisted that their discharge was unconstitutional. The court read §§ 205(e) and (f) together to "indicate that the legislature wished to allow enlisted members a hearing before the Court-Martial Board and did not wish to afford new cadets and troopers this opportunity to be heard." *Id.* 486 A.2d at 1034. The court recognized that an essential predicate of a due process claim is "an underlying property interest," *id.* 486 A.2d at 1034, then rejected the plaintiffs' due process claim with the following observations:

> In the absence of a statutory provision to the contrary the State Police are subject to removal at the pleasure of the appointing power. "[A]n individual, to have a property interest justifying the protection of the due process clause, must 'have more than a unilateral expectation of [continued public

**2.** The existence of a property interest in employment turns on the substantive protection afforded the employee under state law, not the procedural protection. The absence of procedural protections under state law for a state public employee who can be discharged only for cause does not mean that the employee does not have a property interest sufficient to trigger due process. *See, e.g., Stephany v. Wagner,* 835 F.2d 497, 500 (3d Cir.1987) (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 539–41, 105 S.Ct. 1487, 1491–93, 84 L.Ed.2d 494 (1985)). If state law provides that a public employee cannot be discharged without cause, a state rule providing

that a discharge may occur without notice of the charges and a pre-termination hearing would violate the due process clause. Where the substantive standards for public employee discharge are ambiguous, however, the procedural protections afforded by state law may shed light on the intention of the legislature concerning those standards. If no review of a discharge decision is permitted, for example, it is more likely that the discharge decision has been committed to the discretion of the employer. Conversely, if review is provided, it is more likely that discharge was intended to be restricted by objective standards.

employment],' he must have 'a legitimate claim of entitlement to it'." *DeWalt v. Barger,* 490 F.Supp. 1262, 1274 (M.D.Pa. 1980), quoting *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

It is clear that once an enlisted member's probationary period has expired, the trooper has an interest in his continued employment for which due process requires a hearing. *Bolden v. Pennsylvania State Police,* 371 F.Supp. 1096 (M.D.Pa. 1974). However, a cadet on probation although having some interest, is not entitled to the same procedures because this is not a substantial interest.

*Id.* at 1034.

In *Sweeting v. Pennsylvania State Police,* 95 Pa.Cmwlth. 45, 503 A.2d 1126 (1986), the probationary troopers had received a pre-termination hearing but had not been advised before the hearing of the charges against them. Since such a notice would have been required if the probationary troopers had a property interest sufficient to trigger due process protection, the issue once again before the court was whether § 205(f) conferred such an interest. The court quoted §§ 205(f) and (e), italicizing the word "may" in the former and the word "shall" in the latter, noting that "while Section 205(e) contains mandatory and limiting language, Section 205(f) does not." *Id.* 503 A.2d at 1128. The court then went on to distinguish the cases the plaintiffs relied upon by noting that under the statutes involved continuing employment was mandated, absent a finding of a specified cause, and was "not a matter of the [public employer's] unfettered discretion." It then concluded:

> But reliance upon cases involving different statutes from which different property rights spring is not helpful to Petitioners' cases for it is clear that Section 205(f) contains discretionary and non-limiting language. As we noted in *Marino,* when contrasting Section 205(f) with 205(e), the latter of which governs permanent status state troopers, it is apparent that the legislature did not intend to confer a property right upon probationary state troopers.

*Id.* 503 A.2d at 1128. Based on this reading of § 205(f), plaintiffs' due process claim was rejected.

The holdings of *Marino* and *Sweeting* were recently reaffirmed in two other Commonwealth Court cases: *Graham v. Pennsylvania State Police,* —— Pa.Cmwlth. ——, 634 A.2d 849 (Pa.Commw.Ct.1993), and *Shiko v. Commissioner,* No. 686 C.D. 1993 (Dec. 3, 1993). In *Graham,* the plaintiff was a former cadet at the Pennsylvania State Police Academy who had been expelled for disciplinary infractions. She appealed her dismissal to Commonwealth Court which had jurisdiction to hear the appeal only if it affected a property interest. The court, citing *Marino* and *Sweeting,* found that it lacked jurisdiction because the plaintiff did not have a property right in her employment. In *Shiko,* the plaintiff was a former cadet at the Pennsylvania State Police Academy who had been expelled for poor academic performance. He appealed his dismissal to Commonwealth Court which found that *Shiko* had no enforceable property right under *Marino, Sweeting,* and *Graham.*

We perceive no reason why the Pennsylvania Supreme Court would decline to adopt the view articulated in *Marino, Sweeting, Graham,* and *Shiko.* While Blanding has tendered a litigable issue, we think the view of the Commonwealth Court finds persuasive support in the text and context of § 205(f). The juxtaposition of § 205(f) with § 205(e), the use of the term "probationary," the breadth and subjectivity of the reference to "violations of the rules, incompetency, and inefficiency," and the denial of any right to a review of the discharge decision all suggest to us that § 205(f) was intended not to confer rights on probationary troopers, but rather to make it clear that probationary troopers were not to have the expectation of continued employment that non-probationary troopers enjoy.

## III.

■ Blanding claims that he was disciplined more harshly than he deserved because he is black and that his discharge therefore violated Title VII. The PSP, against whom this claim is made, does not urge that Blanding failed to make a *prima*

*facie* showing of a Title VII violation under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. Rather, the PSP argues that it came forward with a non-discriminatory explanation for Blanding's discharge, namely, the events of June 16, 1988, and that he has failed to come forward with evidence of pretext or other evidence that would support a finding that race played a role in his discharge. Blanding acknowledges, as he must,[3] that he had the burden of coming forward with such evidence in response to the PSP's motion for summary judgment, but insists that he has done so.

Blanding argues that the following evidence would support a jury finding that his race played a role in the decision to discharge him: (1) Blanding is an African American; (2) Blanding detected personal animosity in Marakovits' attitude towards him after Marakovits learned that Serafine is white; (3) in several respects, Marakovits' report of his investigation misrepresented the facts; and (4) the recommendation of Rostalski and the decision of his superiors to dismiss Blanding were based on the false report submitted by Marakovits. We agree with the district court that this evidence would not support a finding by a fact finder that race played a role in Blanding's discharge.

We assume, without deciding, that the current record would permit an inference that Marakovits harbored a racial bias against Blanding because of his inter-racial relationship with Serafine. As Blanding acknowledges, however, Marakovits did not make the discharge decision. Blanding's discharge was recommended by Rostalski and that recommendation was accepted by Deputy Commissioner Walp and Commissioner Sharpe. Blanding does not allege racial animus on the part of Rostalski, Walp, or Sharpe. Thus, any inference that race played a role in Blanding's discharge would have to be based on a finding that race caused Marakovits' report to be misleading in ways that affected the decision making processes of Rostalski, Walp, and Sharpe.

Marakovits' original and supplemental reports consisted of narrative summaries of what he did and what he had been told by the persons he had interviewed as a series of exhibits. The narrative reports the facts upon which those interviewed were in agreement and notes the conflicting accounts of the interviewees in areas where there were disagreement. It does not comment, or pass any judgment, upon the credibility of Blanding or any other person interviewed. The exhibits include Marakovits' detailed description of his interviews of Blanding on June 22 and July 6, Marakovits' detailed account of his telephone and in person interviews with Serafine on July 12 and November 16, the report of the Philadelphia Police Department, statements written by Blanding on June 21, July 26, and October 31, and a sworn statement of Serafine dated November 16, 1988. The exhibits were submitted without evaluation from Marakovits.

As we have noted, Blanding contends that the materials authored by Marakovits and included in the original and supplemental report contained four errors. The third and fourth errors—a statement that Marakovits supplied Blanding with a copy of the incident report of the Philadelphia Police Department and an observation that Blanding failed to mention in his July 6 interview an alleged threat by Serafine to contact his superiors—seem wholly innocuous and immaterial on their face. The first and second alleged errors are more material to the purpose of the investigation, but in context will not support the inference Blanding seeks to draw.

Blanding alleges that Marakovits' account of his July 6 interview reports that Blanding admitted smoking marijuana with Serafine when he in fact admitted only to being present when marijuana was being smoked. We assume, as we must, that Blanding did not admit to having smoked marijuana. Nothing anywhere in the record, however, indicates that marijuana smoking had anything to do with the discharge. Indeed, the record pro-

---

**3.** *See, e.g., Billet v. CIGNA Corp.*, 940 F.2d 812, 817 (3d Cir.1991); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir.1990); *Chipollini v. Spenc-* *er Gifts, Inc.*, 814 F.2d 893, 900 (3d Cir.1987) (in banc).

vides assurance that it did not. In her telephone interview, Serafine reported that "she and Blanding had smoked marijuana together in the past." A–252. As a result, Blanding was asked about this in his July 6 interview. He is reported by Marakovits to have stated that he had smoked marijuana during their three to four year relationship but that "the last time he smoked marijuana was more than a year before he entered the Pennsylvania State Police Academy." A–257. When Serafine was interviewed again in Florida, she was advised that the concerns giving rise to the supplemental interview were (1) whether Blanding in fact pointed a loaded gun at her head during their argument, and (2) whether he had "use[d] marijuana with her, or [to] her knowledge [with anyone else], since becoming a Pennsylvania State Policeman." A–270. Serafine asserted once again that Blanding had pointed his gun at her, but her sworn statement indicates that her "answer to [the other] question [was] *no*. He did not use marijuana after becoming a Pennsylvania State Police officer. To [her] knowledge the last known incident of [his] using marijuana was months prior to his becoming an officer." A–272. Finally, neither the charging document nor Rostalski's explanation for his discharge recommendation made any reference to marijuana. Given these facts, any inference that Blanding's discharge resulted from Marakovits' report that he admitted using marijuana would be sheer speculation.

Marakovits' narrative description of his investigation concluded with the following statements:

> It should be noted that at no time during the confrontation outside BLANDING'S residence, did he attempt to identify himself as a state policeman or exercise any police action. In addition, BLANDING never requested the aid of the Philadelphia Police to resolve the situations which led up to the shooting incident on this date.

A–246. Blanding's claim that the observation about failing to identify himself as a state policeman was false is difficult to understand in light of the following acknowledgement in his written statement of July 26, 1988:

> In retrospect, I realize that I could have done certain things that may well have

resolved this situation, as the situation escalated. First, I could have telephoned the Police, and requested that they remove Miss Serafine from my residence, during the argument. Second, when Miss Serafine left my residence, I should not have stepped outside. Third, when I was approached by the six black males, I could have identified myself as a Trooper.... I did not want to reveal the identity of my occupation in the drug infested neighborhood where I live, although I was compelled to protect myself from personal injury, and from property damage.

A–266–67.

In short, given the nature of the alleged errors in Marakovits' report and Rostalski's explanation for his discharge recommendation, the record will not support a factual finding of a connection between those alleged errors and the discharge decision. It follows that Blanding has failed to come forward with sufficient evidence that the alleged bias of Marakovits played a role in Blanding's loss of employment. Summary judgment on his Title VII claim was thus appropriate.

In reaching this conclusion, we have not overlooked Blanding's reliance on the PSP disciplinary records of John Snyder and Richie Pendergrass, two white troopers. Snyder joined the PSP in 1970. In 1986, the BPR investigated him for allegedly pointing a gun at his wife while intoxicated. Rostalski imposed a penalty of five days' suspension. Pendergrass joined the PSP in 1981. He was investigated for an incident occurring in 1985 in which he forced his way into a residence in an attempt to interview an uncooperative witness. Rostalski imposed a penalty of 15 days' suspension. Since we do not understand Blanding to be claiming that Rostalski harbored racial bias against him, we would fail to perceive the relevance of these case histories even if we thought a finder of fact could conclude that these troopers were similarly situated with Blanding. As the district court stressed, however, they were not similarly situated. Both were tenured troopers, one having served fifteen years and the other four years. Probationary troopers

have traditionally been terminated more readily by the PSP than non-probationary troopers.

## IV.

■ Finally, Blanding asserts that Marakovits violated § 1981 of the Civil Rights Act, 42 U.S.C. § 1981, by engaging in racially motivated conduct that caused his discharge.[4] Section 1981 provides in relevant part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ...

The district court granted summary judgment on the claim to Marakovits, relying on *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). That case held that because "[s]ection 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations," it only applies to the initial formation of a contract. Therefore, "the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." *Id.* at 177, 109 S.Ct. at 2373. As we held in *Hayes v. Community Gen. Osteopathic Hosp.*, 940 F.2d 54 (3d Cir.1991), this means that, prior to the Civil Rights Act Amendments of 1991, § 1981 did not create a cause of action for discriminatory discharge. While the Civil Rights Act Amendments of 1991 overruled *Patterson*,[5] the district court rejected Bland-

ing's argument that those amendments should be applied retroactively to his case.

We need not reach the issue of whether the 1991 amendments to § 1981 should be applied retroactively. We assume for present purposes that retroactive application of § 1981 is appropriate and that Blanding would have a § 1981 claim against Marakovits if he had engaged in racially discriminating conduct that caused Blanding's discharge. As we have demonstrated in our discussion of Blanding's Title VII claim, however, the current record will not support a finding of a causal connection between the allegedly biased conduct on Marakovits' part and Blanding's discharge.

## V.

The judgment of the district court will be affirmed.

---

4. The pertinent part of Blanding's complaint reads:

51. Mr. Marakovits' actions in intentionally preventing Mr. Blanding from forming a contract with the PSP for employment as a non-probationary trooper constituted an act of discrimination in violation of 42 U.S.C. § 1981.
52. Mr. Marakovits' actions in intentionally causing Mr. Blanding's discharge from the PSP constituted an act of racial discrimination in violation of 42 U.S.C. § 1981.

Appellant's Brief, A–11.

5. Section 1981 was amended in 1991 to read:

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.