**Thomas D. PORTER, Plaintiff,**

v.

**STATE OF ILLINOIS, DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Jess McDonald, John Goad, Mary Ellen Eads, Kathy Glenney, and Marcia Williams, Defendants.**

**No. 95 C 4077.**

United States District Court, N.D. Illinois, Eastern Division.

Dec. 16, 1997.

Cir.1996)) in assuming, without having to decide, that the *Price Waterhouse* approach also applies in the ADEA context.

**668**

Porter D. Thomas, Chicago, IL, pro se.

Mary Beth Wheeler, Chicago, IL, for Thomas D. Porter.

Maura Ann Fennelly, Ill. Atty. Gen., Chicago, IL, for Ill. Dept. of Children and Family Services, Jess McDonald, John Goad, Mary Ellen Eads, Kathy Glenney, Marcia Thomas.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Plaintiff Thomas Porter alleges that he was fired from his job at the Illinois Department of Children and Family Services because of his age, race, and complexion. He asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, the Age Discrimination in Employment Act, 29 U.S.C. § 623, and the Equal Protection Clause of the Fourteenth Amendment as made actionable by 42 U.S.C. § 1983. Defendants moved for summary judgment, and that motion will be granted for the reasons stated below.

I. *Factual Background*

Plaintiff Thomas Porter is a light-skinned African–American male who was sixty-five years old when he was hired as a child protection investigator by the Illinois Department of Children and Family Services (DCFS) on May 17, 1993. For most or all of his employment at DCFS, plaintiff was supervised by an African–American woman named Marcia Williams. In the summer of 1994, Williams approached her own supervisor, Kathy Glenney, about various problems she was having with plaintiff's work performance. Glenney convened a predisciplinary

hearing to review the charges on August 4, 1994. The hearing was attended by Glenney, Williams, plaintiff, and a union steward named Ed Schwartz.

Williams presented the charges against plaintiff at the hearing. She explained that on June 15, 1994, plaintiff was assigned to visit a home where a twelve-year old was found with numerous bodily marks and other children were thought to be at risk. Plaintiff made one unsuccessful attempt to contact the home but did not initiate any further visits. On June 21, 1994, Williams reminded plaintiff that he needed to establish contact with the home as soon as possible. When plaintiff did not comply, Williams specifically directed him to visit the home by July 19, 1994. Once again, plaintiff ignored her instruction. Williams also explained that plaintiff failed to include complete reports in the case file. Based on this evidence, plaintiff was charged with failing to make ongoing attempts to see child victims in violation of DCFS Procedure 300.100(a)(2) and with failing to complete required notifications in response to allegations of child abuse or neglect in child care facilities in violation of DCFS Procedure 300.160(b).

After reviewing the charges, conferring with Williams, and seeking guidance from her supervisor Mary Ellen Eads, Glenney prepared a predisciplinary report which recommended that plaintiff receive a one-day suspension. Because Glenney lacked final authority to impose that discipline, she forwarded her report and recommendation to the Labor Relations Department, which decided that plaintiff would be suspended for a single day on September 23, 1994. Plaintiff was also warned that any future infractions might result in his termination.

On October 24, 1994, plaintiff met with Assistant State's Attorney Renee Thibault to prepare his testimony for a temporary child custody hearing. Four days later, Thibault wrote a letter to Marcia Williams recording the events of that meeting. She explained that plaintiff refused to answer her questions about the case and would not indicate whether he had read the case file. When Thibault urged plaintiff to cooperate, he became hostile and said that he knew she had called his supervisor. Thibault indicated that they had never met before, but that she planned to call his supervisor regarding his poor attitude and lack of preparation in that meeting. Porter then told Thibault that "she had better watch out when [she] went to [her] car." (Porter Dep.Exh. 10.) This interchange was witnessed by two other people in the room. Thibault promptly informed the presiding judge of what had transpired, and he recused himself from the case. Plaintiff contends that Thibault fabricated the entire incident because she is a racist.

In November 1994, Williams prepared a written evaluation of plaintiff's work for the period covering July 1993 through October 1994. Based on a quantitative analysis of the 187 cases that were assigned to plaintiff during that period, Williams concluded that he had failed to meet any of his target completion rates. Although plaintiff was expected to achieve a twenty-four hour compliance rate of 100 percent, his actual compliance rate was only 93 percent. His thirty-day completion rate of 60 percent was considerably short of his 75 percent goal. And while plaintiff had an overall case completion goal of 85 percent, he managed to finish only 81 percent of his cases. Finally, plaintiff's overdue case rate of 19 percent was far above the allowed rate of 2 percent. Williams indicated that plaintiff did not achieve any of his annual performance objectives and that he needed improvement in each of the nine categories of his general performance appraisal.

Williams also wrote on the evaluation that plaintiff needed "constant guidance with completing his case assignments. His cases had to be returned several times due to poor documentation of the facts of the investigations, incomplete departmental forms and not completing forms according to departmental procedures. Mr. Porter has been counseled on his inability to make critical decisions in case investigations and to meet departmental time frames. Thomas was given instructional manuals for completing departmental forms. Whenever he was told to refer to those instructions, he was unable to locate them; therefore, supervisor would give him additional manuals. Mr. Porter's cases were prioritized and [he was] given written in-

structions on completing cases. Even with this direct coaching, Mr. Porter would not complete cases as instructed, resulting in cases being returned for same tasks [sic]. Due to the constant return of cases, Thomas developed a huge amount of pending cases (in excess of 45 at one time). This resulted in a decrease in assignments; eventually, the cases were reassigned to other investigators to be completed." (Porter Dep.Exh. 7.) Finally, Williams recommended that plaintiff retake the child protection investigator training program in Springfield. Plaintiff attests that he retook the training course in November or December of 1994.

The first page of the evaluation form states that the written performance review is part of an objective appraisal system designed "to let employees know how they are doing, to motivate them to improve their performance and to justify administrative personnel decisions." (Porter Dep.Exh. 7.) The form describes a system of quarterly progress reviews and annual reassessments of employee performance objectives. Although the evaluation system imagines a high level of employee involvement, plaintiff was not evaluated on a quarterly basis and never received a copy of his November 1994 evaluation.

Williams prompted Glenney to convene a second predisciplinary hearing on November 4, 1994. The attendees included Williams, Glenney, plaintiff, and union steward Mark Galloway. Based on the letter by Assistant State's Attorney Thibault, plaintiff was charged with making a threatening statement to her on October 24th. Plaintiff was also charged with failing to make ongoing attempts to visit child victims in sixteen separate cases assigned to him between May and September of 1994. In each of these cases, plaintiff made a good faith attempt to initiate a site visit but did not make any follow-up efforts to establish or maintain contact.

Plaintiff was also charged with poor quality work in four cases. In a case identified as BR, plaintiff failed to make himself aware of a judicial order in the case, disregarded several direct instructions to obtain the order, neglected to submit the case for follow-up in a timely manner, and omitted important information from the early response packet. In case RW, plaintiff failed to raise the issue of mental injury when he spoke with a case reporter, ignored the case for more than a month, failed to document court proceedings, neglected to prepare for a hearing, missed a court date, and failed to submit the case for follow-up. These omissions resulted in the vacation of a temporary custody order and the return of a minor to an at-risk home. In another case identified as BR, plaintiff made no effort to pursue follow-up contacts with a family after his initial visit and failed to address the allegations of abuse during the home interview. As a result, this case was ultimately assigned to another investigator. In case CW, plaintiff failed to document any contact with children who were thought to be at risk, failed to provide necessary information about the case to an investigator, failed to cooperate with the Assistant State's Attorney at a custody hearing, and prematurely submitted the case for completion.

Finally, plaintiff was charged with failing to meet a specific deadline for reducing his caseload. In an effort to help plaintiff manage his work, his supervisors reassigned several of his cases, reduced his case intake, and directed him to complete fifteen cases by October 17, 1994. Glenney even told plaintiff that she would evaluate his efforts based on the number of cases that he was able to complete rather than the quality of his work. By October 17, plaintiff had completed only two cases and both were returned to him for corrections.

Glenney reviewed the evidence against plaintiff, consulted with Marcia Williams and Mary Ellen Eads, solicited guidance from the Labor Relations Department, and recommended that plaintiff be discharged. Notably, the record does not reflect that plaintiff took advantage of an opportunity to provide a written rebuttal to the charges against him. Glenney forwarded her recommendation to the Labor Relations Administrator, who then suggested to the Director of the Illinois Department of Central Management Services that plaintiff should be discharged. The Director made the final decision to fire plaintiff. Accordingly, plaintiff was suspended pending discharge on December 17, 1994 and was

terminated for cause on January 16, 1995. Plaintiff pursued the regular union grievance procedures for challenging his termination.

Plaintiff "denies that he ignored his cases and that he failed to follow the procedures established by defendant DCFS for the completion of his work." (Resp. to S.J. at 6). He claims that Williams invented the charges against him and rejected work that was actually "well thought of and well investigated and timed." (Porter Dep. at 83.) Plaintiff also boasts that he completed "hundreds" of cases successfully during his tenure at DCFS. (Porter 10/31/97 Aff. ¶ 4.) Notably, however, plaintiff offers nothing more than his own affidavit and deposition testimony to support these claims, and he does not address any of the specific charges levied against him.

Plaintiff asserts that Glenney and Williams made statements which confirm that his termination was motivated by racial bias. Plaintiff alleges that Glenney told him in October of 1994 that she had "nothing to do with what is being done to you." (Porter 10/31/97 Aff. ¶ 5). Glenney denies that this conversation ever took place. Plaintiff also attests that: "During one of my first meetings with Marcia [Williams] soon after she became my supervisor, she told me that she did not like light-skinned African American men and that she was going to get rid of me before my probationary period was over." (Porter 10/31/97 Aff. ¶ 2.) Although Williams denies that this conversation occurred, she acknowledges that she prefers dark-skinned men as mates or social partners. She admits that she discussed this with her friends but does not recall whether she shared that information with plaintiff.

Plaintiff contends that his work assignments were not returned to him by his first supervisor at DCFS or by any of the supervisors who substituted for Williams. Plaintiff does not provide any specific evidence to support this claim, however, and Williams testified that cases were returned to plaintiff regardless of whether she or a substitute was acting as his supervisor. Notably, there is a factual question as to whether plaintiff even had a supervisor before Williams. Williams became a supervisor in May 1993, the same month plaintiff was hired as an investigator, and she testified that she was plaintiff's supervisor throughout his employment at DCFS. While plaintiff maintains that he had a different supervisor when he first arrived on the job, he does not remember her name or how long he worked for her.

Plaintiff testified at his deposition that he was treated less favorably than investigators who were not light-skinned black males over forty. He claims that his cases were returned more frequently than those of a woman in her thirties named Ms. Hardon, a man in his thirties or forties named Victor Buford, and a light-skinned woman in her thirties of mixed African–American and Puerto Rican descent named Maria. He also claims that no cases were returned to a Filipino man in his fifties named Manny or to a black man of "medium" complexion in his fifties named Aaron Walker. Plaintiff asserts that these investigators were never disciplined for violations of DCFS regulations. Plaintiff does not, however, indicate whether these individuals were supervised by defendant Williams or present any specific evidence to demonstrate that the quality of his work was comparable to that of his coworkers.

Plaintiff filed the instant suit against DCFS and five individual DCFS employees on July 14, 1995. Defendant Marcia Williams—identified in early case documents as Marcia Thomas—became a Child Welfare Supervisor in May of 1993 and served as plaintiff's direct supervisor for most or all of his employment at DCFS. Defendant Kathy Glenney was a Child Protection Manager who served as Williams' supervisor from February 1994 through January 1995. Glenney reported to defendant Mary Ellen Eads, the Regional Administrator for the Cook County Child Protective Services. Mary Ellen Eads was supervised by defendant John Goad, the Associate Deputy Director of the Child Protection Services for Cook County. Goad answered directly to defendant Jess McDonald, the Director of DCFS

Plaintiff initially asserted his statutory and constitutional claims against each of the defendants in this case. On August 11, 1997, the court dismissed the Title VII and ADEA claims against the individual defendants and

the equal protection claim against DCFS. The only claims remaining at this point in the litigation, then, are the Title VII and ADEA claims against DCFS and the section 1983 claim against the individual defendants. *See Porter v. DCFS*, 1997 WL 460965 (N.D.Ill. 1997) (not reported F.Supp.). Defendants moved for summary judgment on each of these remaining claims.

## II. *Discussion*

The court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, the court must view all the facts and draw all permissible inferences in favor of the non-moving party. *Associated Milk Producers, Inc. v. Meadow Gold Dairies, Inc.*, 27 F.3d 268, 270 (7th Cir.1994). The summary judgment standard should be applied "with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994).

## A. Title VII

To overcome a motion for summary judgment on a claim of intentional discrimination under Title VII, plaintiff must present sufficient evidence to raise an inference that race was a motivating—but not necessarily a decisive—factor in his discharge. *See Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1350 (7th Cir.1995), *discussing* 42 U.S.C. § 2000e–2(m). Plaintiff can meet this burden head on by introducing direct or circumstantial evidence to show that his termination was motivated in some part by race. *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997). Alternatively, he can rely on the burden-shifting scheme described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Here plaintiff pursues both methods of proof.

### 1. Direct Proof

Plaintiff contends that the record on summary judgment contains sufficient direct and circumstantial evidence to raise an inference that race was a motivating factor in his discipline and discharge. Direct evidence is that which, if believed, proves the fact in question without reliance upon inference or presumption. *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir.1989). In a bias suit, direct evidence is that which can be interpreted as an admission of an employer's discriminatory intent. *Rothman v. Emory University*, 123 F.3d 446, 451 (7th Cir.1997). Circumstantial evidence is that which provides "a basis for drawing an inference of intentional discrimination." *Troupe v. May Dept. Stores*, 20 F.3d 734, 736 (7th Cir.1994). It may consist of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which a discriminatory intent might be drawn." *Id.*

### a. Direct Evidence

■ Plaintiff cites the Williams statement as direct evidence that race was a motivating factor in his termination. Plaintiff states in his affidavit that: "During one of my first meetings with Marcia [Williams] soon after she became my supervisor, she told me that she did not like light-skinned African American men and that she was going to get rid of me before my probationary period was over." (Porter 10/31/97 Aff. ¶ 2.) Although Williams denies that this conversation occurred, she acknowledges that she prefers dark-skinned African–American men as social partners or mates. She also admits that she discussed this fact with her friends, but she does not recall whether she also shared that information with plaintiff. Williams contends that this evidence is immaterial because the record does not reveal any causal link between her statement and plaintiff's subsequent termination.

A statement is direct evidence of discrimination only if it relates to the "motivation of the decisionmaker responsible for the contested decision." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th

Cir.1997), *quoting Cheek v. Peabody Coal Co.*, 97 F.3d 200, 203 (7th Cir.1996). While "[s]tatements made by inferior employees are not probative of an intent to discriminate by the decisionmaker," *Chiaramonte*, 129 F.3d at 397, such employees may be regarded as decision-makers if they exercise a significant degree of influence over contested employment decisions. *See Blanding v. Pennsylvania State Police*, 12 F.3d 1303, 1308 (3d Cir.1993) (employee without final decision-making authority may be regarded as decision-maker if his bias significantly influences decisional process); *EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1094 (5th Cir.1994) (employee without final decision-making authority regarded as decision-maker because he recommended discharge and supervisor relied on recommendation); *Perfetti v. First National Bank of Chicago*, 950 F.2d 449, 453 n. 5 (7th Cir.1991) (inferior employee who controls which applicants are considered for employment is decision-maker); *Ratner v. United Air Lines, Inc.*, 1997 WL 433633, at *6 & n. 3 (N.D.Ill.1997) (not reported F.Supp.) (employee without final decision-making authority was regarded as decision-maker where his recommendation was basis for contested decision). *Compare Chiaramonte*, 129 F.3d at 396 (supervisor was sole decision-maker despite consultation with others); *Aungst v. Westinghouse Electric Corp.*, 937 F.2d 1216, 1221 (1991) (same), *overruled on other grounds, Oxman v. WLS–TV*, 12 F.3d 652, 657 (7th Cir.1993); and *Jacklovich v. Metropolitan Water Reclamation Dist.*, 1994 WL 649096, at *6 (N.D.Ill.1994) (not reported F. Supp.) (supervisor whose written evaluation of discharged employee was sent to final decision-makers was not significant participant in final decision). *See also* Gorski, Stephen J., and Rod M. Fliegel, "Silence is Golden: Guidelines for Evaluating the Admissibility and Legal Sufficiency of 'Age–Related' Statements in Age Discrimination Cases," 11 *Lab.Law* 189, 200 & nn. 90–95 (1995). These authorities teach that the statement of an employee who lacks final decision-making authority may be probative of intentional discrimination if there is evidence from which a trier of fact might conclude that the employee exercised a significant degree of influence over the contested employment decision.

The parties do not dispute that Williams lacked authority to discharge plaintiff or even to recommend his discipline or discharge. As a matter of state law, final disciplinary authority was vested in the Director of the Illinois Department of Central Management Services. But there is also evidence that Williams played a significant role in the decision to fire plaintiff. As plaintiff's immediate supervisor, Williams monitored his work and prepared the negative evaluation of November 1994. She initiated the charges that led to both of his predisciplinary meetings, and she conversed with Glenney as Glenney decided whether or not to recommend discipline. Although the record does not reveal the extent to which the final decision-making authorities actually relied on the charges formulated by Williams, it contains sufficient evidence to raise a factual question about whether she had a significant hand in their decision.

The possibility that Williams played a significant role in plaintiff's termination does not imply that her alleged bias was also a material factor in that discharge. An admission of bias is material only if it is "related to the employment decision in question." *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1403 (7th Cir.1996). Plaintiff seeks to forge this causal relationship by suggesting that racial animus led Williams to reject his work—thus saddling him with an artificially inflated caseload—or to invent the charges against him. To support these arguments, plaintiff must produce enough evidence to raise an inference that his work was satisfactory or that he was unfairly singled out for discipline. These propositions find absolutely no support in the record.

As will be set forth more fully below, plaintiff offers no specific evidence to rebut the charges that formed the basis of his discharge. Nor does he cite any evidence other than his own word to show that his work was comparable to that of his colleagues who were not disciplined or discharged. The fact that plaintiff failed to meet his deadlines even after his supervisors reassigned his pending cases and reduced his case intake

suggests that he would have been unable to do his job even if Williams had not returned his work. Standing alone, plaintiff's own testimony about the quality of his job performance does not discredit the evaluation of his work offered by his employer. *Aungst*, 937 F.2d at 1221; *Armstrong v. United Airlines, Inc.*, 883 F.Supp. 1172, 1179 (N.D.Ill.1995). Accordingly, the court finds that the Williams statement bears no material relationship to plaintiff's termination and is not direct evidence of intentional discrimination.

■ Plaintiff also alleges that, during a conversation with Kathy Glenney in October 1994, she told him that she had "nothing to do with what is being done to you." (Porter 10/31/97 Aff. ¶ 5.) The court finds that this statement is not direct evidence of discrimination because it makes absolutely no mention of plaintiff's race, color, or age. *Randle*, 876 F.2d at 569 (direct evidence must "speak directly to the issue of discriminatory intent").

b. Circumstantial Evidence

■ Plaintiff contends that the Williams and Glenney statements are circumstantial evidence of discrimination when viewed together with "the fact that he was never evaluated during his entire twenty-month tenure with Defendant DCFS in direct contravention of said Defendant's own procedures, [the fact that] Defendant Thomas constantly gave his cases back to him to redo while providing him little if any instruction on how to correct his perceived deficiencies, and the treatment he and several of his friends received in contrast with that of younger, darker-skinned, non-black employees." (Resp. to S.J. at 8–9.) The court must consider whether this evidence, viewed as a whole, forms a "convincing mosaic" of intentional discrimination. *Troupe*, 20 F.3d at 737.

Plaintiff argues that he was treated less favorably than child protection investigators who were not light-skinned African–American men over forty. He claims that his cases were returned more frequently than those of a woman in her thirties named Ms. Hardon, a man in his thirties or forties named Victor Buford, and a light-skinned woman in her thirties of mixed African–American and Puerto Rican descent named Maria. He alleges that no cases were returned to a man of Philipino descent in his fifties named Manny or to a black man of "medium" complexion in his fifties named Aaron Walker. Plaintiff also alleges that none of these other child protection investigators were disciplined. This evidence fails to support an inference of intentional discrimination for the primary reason that plaintiff offers nothing but his own word to establish that the quality of his work was comparable to that of his colleagues. *Aungst*, 937 F.2d at 1221. Moreover, plaintiff does not allege that these individuals were supervised by Williams.

Plaintiff finds evidence of discrimination in the fact that he did not receive quarterly evaluations and was never given a copy of his negative review of November 1994. The review form explains that the purpose of the evaluation system is to provide regular feedback to DCFS employees so that they can improve their work. Plaintiff argues that his supervisors would not have waited so long to confront him if he "was so derelict in his duties and his defalcations were so dire as to lead to his discharge." (Resp. to S.J. at 6.) This argument overlooks evidence that plaintiff received considerable feedback regarding the quality of his work. When plaintiff had case management problems in the summer of 1994, Glenney promptly convened a hearing to review those issues. Plaintiff was disciplined with a one-day suspension and warned that future problems might lead to his termination. Later, Williams and Glenney reassigned plaintiff's pending cases, reduced his case intake, and directed him to close fifteen cases by a specified date. Williams also returned a number of plaintiff's cases because he had failed to complete them properly. Because plaintiff was given extensive feedback about his work, the fact that he did not have quarterly evaluations and did not receive a copy of his November 1994 evaluation does not suggest that his work was acceptable or that his discharge was motivated by intentional discrimination.

Plaintiff complains that he was never given an opportunity to improve his performance after he retook the child protection investiga-

tor training course in November or December of 1994. Williams recommended that plaintiff retake the training course in his November 1994 evaluation—the evaluation that plaintiff never saw. Although defendants correctly point out that this document is not competent evidence that plaintiff retook in the course, plaintiff also states in his affidavit that he completed the program shortly after his second predisciplinary hearing on November 4, 1994. Presumably, he did so before his permanent suspension on December 17, 1994. Plaintiff suggests that he would have been given an opportunity to improve his work if the quality of his work were the real reason for his discharge. The fact that plaintiff was discharged shortly after returning from Springfield does not, however, imply that his work was satisfactory. To the contrary, the fact that plaintiff was asked to retake his training program is compelling evidence that his work was inadequate. The timing of these events is easily explained by the fact that plaintiff attended the course before his termination was approved by senior agency officials.

Finally, plaintiff argues that the Williams and Glenney statements are circumstantial evidence of intentional discrimination. Taken in isolation, perhaps, these statements could be interpreted to reveal that Williams harbored a racial bias against plaintiff and that Glenney knew of a scheme to effect his termination. Of course, Glenney's statement could also be construed as a declaration that plaintiff himself was responsible for his employment troubles. When the Williams and Glenney statements are considered in light of the evidence that plaintiff was not performing his job adequately at the time of his termination, however, it is apparent that they are insufficient raise an inference that was plaintiff fired because of his race or skin color. Accordingly, the court finds that plaintiff has failed to present enough circumstantial evidence to form a "convincing mosaic" of intentional discrimination.

## 2. Indirect Proof

Plaintiff attempts to raise an inference of intentional race and age discrimination using the burden-shifting formula stated in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817. Under that analysis, plaintiff must first establish a prima facie case of discrimination by showing that (1) he was in a protected group, (2) he was performing his job satisfactorily, (3) he suffered an adverse employment action, and (4) he was treated less favorably than similarly situated employees outside the protected class. *Plair*, 105 F.3d at 347. This raises a presumption of intentional discrimination which the employer may rebut by articulating a legitimate non-discriminatory reason for the contested employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the employer succeeds, then the presumption of discrimination dissolves and the burden shifts back to plaintiff to show that the proffered explanation is pretextual. *Id.* at 256, 101 S.Ct. at 1095. At all times, plaintiff bears the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).

Where, as here, the parties dispute whether plaintiff was performing his job adequately at the time of his discharge, the court may assume that plaintiff has met his prima facie burden and advance directly to the ultimate issue of pretext. *EEOC v. Our Lady of the Resurrection Medical Center*, 77 F.3d 145, 149–150 (7th Cir.1996); *see also Washington v. DCFS*, 919 F.Supp. 1182, 1188–1189 (N.D.Ill.1996) (collecting cases). Plaintiff may establish pretext by showing that his termination was more likely than not motivated by discriminatory intent or that his employer's explanation for his termination is unworthy of credence. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. A plaintiff may not simply disagree with the employer's decision, but rather must show that the employer did not honestly believe the stated reasons for the decision. *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992). The court must not assume the mantel of a "super-personnel department that reexamines an entity's business decisions." *Wolf v. Buss (America), Inc.*, 77 F.3d 914, 920 (7th Cir.1996).

Defendants cite a good deal of specific evidence to show that plaintiff was fired because of his poor work performance. Plaintiff received a one-day suspension on September 23, 1994 following charges that he violated DCFS Procedures 300.100(a)(2) and 300.160(b). Assistant State's Attorney Renee Thibault informed DCFS officials that plaintiff threatened her during a meeting on October 24, 1994. Although plaintiff denies that he threatened Thibault, he offers no evidence to show that DCFS officials disbelieved her version of the events in question. In November 19994, Williams conducted a quantitative survey of plaintiff's case work and found that he had not achieved any of his target case completion rates. Plaintiff failed to make ongoing attempts to see child abuse or neglect victims in sixteen separate cases assigned to him between May and September of 1994. He was charged with poor quality work in four separate cases. He was unable to close fifteen cases by a supervisory deadline of October 17, 1994 despite the fact that his pending cases were reassigned and his intake was reduced. Finally, plaintiff himself testified that Williams returned a large number of his cases for correction.

Plaintiff relies on virtually the same evidence to establish pretext as he cited in support of his direct case of discrimination. First, plaintiff disputes the accuracy of his performance evaluations by pointing out that they were prepared by Marcia Williams, a woman whose preference for dark-skinned African–American men is now a matter of public record. Plaintiff does not, however, present any specific evidence to contradict the charges against him. Plaintiff remonstrates that he cannot establish the quality of his work because defendants failed to produce the actual case files in discovery. The docket bears no indication that plaintiff filed a motion to compel the production of those documents, however, and plaintiff makes no effort to address the specific charges against him in either his affidavit or deposition testimony. Standing alone, plaintiff's own insistence that the quality of his work was satisfactory does not support an inference that the stated reasons for his discharge were pretextual. *Aungst,* 937 F.2d at 1221; *Armstrong,* 883 F.Supp. at 1179.

Plaintiff contends that his work was not returned to him by his first supervisor or by any of the supervisors who substituted for Williams. As an initial matter, it is unclear whether plaintiff even had a supervisor before Williams. Williams became a supervisor in May 1993—the same month that plaintiff was hired—and she asserts that she was plaintiff's immediate supervisor throughout his employment at DCFS. Plaintiff contends that he had a different supervisor when he first arrived on the job, but he cannot recall her name or how long he worked for her. Even if plaintiff had a supervisor before Williams who thought favorably of his work, that evidence would be immaterial because plaintiff has produced nothing to show that the quality of his work was consistent over time. The possibility that plaintiff's work was satisfactory in 1993 does not undermine the concrete evidence that his work was substantially less than satisfactory at the time of his discharge in late 1994. *Hong v. Children's Memorial Hospital,* 993 F.2d 1257, 1262 (7th Cir.1993) (relevant issue is whether plaintiff was performing job at the time of his termination).

Plaintiff suggests that there is reason to question whether his errors were sufficiently grievous to support his discharge because he did not have quarterly evaluations, did not receive a copy of his November 1994 evaluation, and did not get a chance to improve his performance after he returned from his training course in Springfield. He also argues that he was treated less favorably than other child protection investigators who were not light-skinned African–American men over forty. The court has already weighed these arguments and has determined that they do not show that plaintiff's work was satisfactory. Accordingly, the court finds that plaintiff has failed to raise a factual question about whether the stated reasons for his discharge were pretextual.

## B. ADEA

Plaintiff claims that he was discharged because of his age in violation of the ADEA. 29 U.S.C. § 623. To overcome a motion for summary judgment on a claim of age dis-

crimination under the ADEA, a plaintiff must produce sufficient to show that age was a decisive factor in his termination. *Fuka,* 82 F.3d at 1402, *citing Gehring v. Case Corp.,* 43 F.3d 340, 344 (7th Cir.1994) (issue is whether termination would have occurred "if the employee had been younger than 40 and everything else had been the same"). As with a claim of race discrimination under Title VII, plaintiff can meet this burden using either the direct or indirect method's of proof outlined above. *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122 (7th Cir.1994). Rather than accord separate treatment to his claim under the ADEA, plaintiff simply relies on the evidence and arguments discussed above to raise an inference that he was discharged because of his age as well as his race. Accordingly, the court's finding that plaintiff has not produced sufficient evidence to raise an inference of intentional race discrimination applies with equal force to his claim of age discrimination.

### C. Section 1983

Finally, plaintiff claims that he was fired because of his race, age, and skin color in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. A claim of intentional discrimination claim under the Equal Protection Clause is subject to the same methods of proof as analogous claims under Title VII or the ADEA. *See Dugan v. Ball State Univ.,* 815 F.2d 1132, 1135–1136 (7th Cir.1987); *Huebschen v. Dept. of Health and Social Svcs.,* 716 F.2d 1167, 1170 (7th Cir.1983), *citing Rivera v. City of Wichita Falls,* 665 F.2d 531, 534 n. 4 (5th Cir.1982). Because the record in this case does not raise an inference of intentional discrimination under either Title VII or the ADEA, defendants are entitled to summary judgment on the section 1983 claim as well. The court also notes defendants Jess McDonald, John Goad, Mary Ellen Eads, and Kathy Glenney are entitled to summary judgment for the additional reason that the complaint refers to them only as supervisory employees of DCFS and does not indicate that they are sued in their personal capacities. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989) (state offi-

cial liable under section 1983 only if sued in personal capacity); *Kolar v. County of Sangamon,* 756 F.2d 564, 568 (7th Cir.1985) (failure to specify that state official is named in personal capacity raises presumption that he is named in official capacity only).

### III. Conclusion

Defendants have presented virtually overwhelming evidence that plaintiff was not performing his job adequately when he was discharged from his job at DCFS. Rather than produce any specific evidence to rebut these charges, plaintiff relies primarily on his own self-serving testimony to show that his work was adequate. Accordingly, the court finds that the record contains insufficient evidence to raise an inference that plaintiff was fired because of his age, race, or complexion in violation of Title VII, the ADEA, or the Equal Protection Clause of the Fourteenth Amendment.

ORDERED: Defendants' motion for summary judgment is granted.